PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

RONALD C. FORREST,
*Defendant-Appellant.*

No. 04-4665

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CR-03-458-AW)

Argued: September 19, 2005

Decided: November 14, 2005

Before WILKINSON and MOTZ, Circuit Judges, and
R. Bryan HARWELL, United States District Judge
for the District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Wilkinson and Judge Harwell joined.

## COUNSEL

**ARGUED**: Gary Eugene Bair, BENNETT & BAIR, L.L.P., Green-
belt, Maryland, for Appellant. Gina Laurie Simms, Assistant United
States Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Greenbelt, Maryland, for Appellee. **ON BRIEF:** Allen F. Loucks,
United States Attorney, Greenbelt, Maryland, for Appellee.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Ronald Forrest challenges his conviction for the sexual exploitation of a child in violation of 18 U.S.C.A. §§ 2251(a) and 2252A(a)(5)(b) (West 2000). He contends that Congress's Commerce Clause authority does not extend to his private, intrastate production and possession of child pornography, and that the district court erred in admitting certain photographs and expert testimony. Forrest also maintains that his sentence should be vacated and remanded because the district court mistakenly believed the then-mandatory Sentencing Guidelines required imposition of a prison term. We reject each of these arguments, and affirm the judgment of the district court.

I.

Forrest was the Chief of Police of the Seat Pleasant, Maryland Police Department. He met the victim, Steven, through the department's Junior Police Program. Steven helped found the program because he hoped to become a police officer and wanted to learn more about police work. Initially, the two interacted only when Forrest oversaw the program's activities on weekends. Eventually, however, Steven asked if he could come over to Forrest's house. Forrest agreed. Steven would go to Forrest's house either to do chores (such as mowing the lawn) or to "go[ ] out somewhere" with him. Beginning in January 2001, around the time Steven turned thirteen, he started spending the night at Forrest's house. When Forrest's daughter was away, Steven would sleep in her room, but when she was home he would stay with Forrest in his room. Through these visits, Steven, who had never lived with his own father, came to view Forrest as a father figure.

Steven asked Forrest to take pictures of him to give to his girlfriend. Forrest took digital pictures of Steven, who was clothed at the time, while an X-rated movie played in the background. That same day, Forrest asked if he could take semi-nude photographs of Steven. Originally, Steven refused but agreed after Forrest asked repeatedly and offered to pay Steven between $50 and $80. Forrest then asked to take fully nude photographs of Steven. Steven again refused, but agreed after Forrest offered to pay him more money.

On a separate occasion, Forrest used a Polaroid camera to take pictures of Steven lying on Forrest's bed. In some of the polaroids Steven was clothed, but in others he was unclothed. Forrest again offered Steven between $50 and $80 to pose for these pictures. Steven also testified that Forrest twice attempted to assault him sexually, once in Forrest's bedroom and once in his office.

In 2003, Forrest's fiancee suspected him of infidelity. While searching his house for evidence, she discovered a photo album in his home office. The album included pictures of Steven and another young man she recognized, as well as nude photographs of the fiancee herself. It also contained pictures of adult males; those images bore the logo of a website called "Rude Jam." She left the album at Forrest's house, but returned a few days later to retrieve the album and turn it over to the FBI. Before turning it over, she removed the nude pictures of herself from the album because they embarrassed her.

FBI officers subsequently searched the hard drives of Forrest's home and office computers. They determined that both hard drives contained the same adult male photographs bearing the "Rude Jam" logo that were found in the photo album.

At trial, the Government presented evidence that an Olympus digital camera found in Forrest's home had been manufactured in Asia. The Government also introduced evidence that the Polaroid camera had been manufactured in Massachusetts. Additionally, the Government offered the testimony of expert witness Kenneth Lanning, who described the relationships between child molesters and their victims and the victims' typical responses to such incidents.

Two defense witnesses testified. Steven's former girlfriend testified that Steven denied that Forrest had ever touched him. A second witness offered her opinion that Steven was a liar.

The jury convicted Forrest of two counts of sexually exploiting a minor for the purpose of producing child pornography in violation of 18 U.S.C. § 2251(a) and two counts of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). At sentencing, defense counsel argued that *Blakely v. Washington*, 124 S. Ct. 2531 (2004), applied to the federal guidelines and objected to enhancement of the

offense level from 27 to 31 on the basis of facts not found by the jury. Overruling that objection, the district court determined that Forrest's offense level and criminal history category called for a sentence in the 108-135 month guideline range. The court then sentenced Forrest to 120 months, the minimum term of imprisonment that a court can impose under § 2251.

## II.

Forrest initially presents an as-applied Commerce Clause challenge to 18 U.S.C. §§ 2251(a) and 2252A(a)(5)(B). He asserts that applying these statutes to him exceeds Congress's Commerce Clause authority because his private intrastate production and possession of child pornography did not substantially affect interstate commerce.[1]

Forrest did not raise this argument in the district court. To be sure, he did argue that the Government had not proven that the materials used to produce the child pornography traveled in interstate commerce. This is not a constitutional attack; it is merely an allegation that the Government did not meet its burden of proving each element of the offenses beyond a reasonable doubt. Because Forrest did not lodge a constitutional challenge in the district court, we review this claim only for plain error. *United States v. Hughes*, 401 F.3d 540, 547 (4th Cir. 2005).

Under plain error analysis, an appellant must show that an error

---

[1]Forrest's assertion derives from his belief that the statutes' jurisdictional limitations — requiring that the pictures be "produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer," 18 U.S.C.A. § 2251(a) (West 2000); *see also id.* § 2252A(a)(5)(B) (using substantially identical language) — do not ensure that his activities affect interstate commerce. Although a jurisdictional element may establish that a given statute "is in pursuance of Congress' regulation of interstate commerce," *United States v. Morrison*, 529 U.S. 598, 612 (2000), an effective jurisdictional element is certainly not required where, as here, the statute directly regulates economic activity. *See, e.g.*, *Gonzales v. Raich*, 125 S. Ct. 2195 (2005) (upholding Controlled Substances Act under Commerce Clause without discussion of statute's jurisdictional element).

occurred, that the error was plain, and that the error affected his substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993). Even if an appellant makes this three-part showing, we should not exercise our discretion to notice an error unless it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *United States v. Young*, 470 U.S. 1, 15 (1985) (internal quotation marks omitted)).

Forrest cannot overcome even the initial hurdle of showing error. The Supreme Court's recent decision in *Gonzales v. Raich*, ___ U.S. ___, 125 S. Ct. 2195 (2005), makes clear that no error resulted from applying §§ 2251(a) and 2252A(a)(5)(B) to Forrest's wholly intrastate production and possession of child pornography. *Raich* rejected a similar as-applied Commerce Clause challenge to the Controlled Substances Act ("CSA") by intrastate growers and users of medical marijuana.

In *Raich* the Court reaffirmed the long-standing principle that the Commerce Clause empowers Congress to regulate purely local intrastate activities, so long as they are part of an "economic class of activities that have a substantial effect on interstate commerce." *Raich*, 125 S. Ct. at 2205 (internal quotation marks omitted) (citing *Perez v. United States*, 402 U.S. 146, 151 (1971), and *Wickard v. Filburn*, 317 U.S. 111, 128-29 (1942)). Moreover, the Court emphasized, Congress needs only a rational basis for concluding that such local activities substantially affect interstate commerce. *Id.* at 2208. Because the *Raich* Court found that the CSA regulated an economic class of activities and that Congress had a rational basis for concluding that local drug possession substantially affected interstate commerce, it held that the *Raich* defendants could not escape the sweep of the statutory prohibition simply because their individual activities assertedly had a *de minimis* effect on interstate commerce. *Id.* at 2206.

The case at hand is strikingly similar to *Raich*. In both, Congress exercised its Commerce Clause authority to regulate "quintessentially economic" activities, *i.e.*, those involving the "production, distribution, and consumption of commodities." *Id.* at 2211. True, the regulated commodities differ; in *Raich*, the commodity was marijuana, here it is child pornography. But that distinction is immaterial. In both statutes Congress "directly" regulated economic activity in a "fungible

commodity," *id.* at 2206, by, *inter alia*, prohibiting its possession. *See also United States v. Buculei*, 262 F.3d 322, 329 (4th Cir. 2001) (holding that possession and production of child pornography "is economic in nature").

Moreover, in both instances Congress had a rational basis for concluding that prohibition of mere local possession of the commodity was essential to the regulation of "an established, albeit illegal, interstate market." *Raich*, 125 S. Ct. at 2206. Just as Congress rationally concluded that demand might draw homegrown marijuana into interstate markets, thereby "frustrat[ing] the federal interest in eliminating commercial transactions in the interstate market in their entirety," *id.* at 2207, so too might Congress rationally fear that homemade child pornography would find its way into interstate commerce. *Cf. id.* at 2212 ("The congressional judgment that an exemption for such a significant segment of the total market would undermine the orderly enforcement of the entire regulatory scheme is entitled to a strong presumption of validity."). Indeed, this concern is especially salient in the context of child pornography, because much of the material traded on that interstate market is homemade. *See Buculei*, 262 F.3d at 329 (citing findings of the 1986 Attorney General's Commission on Pornography); H.R. Rep. No. 98-536, at 17, *reprinted in* 1984 U.S.C.C.A.N. 492, 508 ("Generally, the domestic material is of the 'homemade' variety, while the imported material is produced by commercial dealers.").

Furthermore, although Congress need not make findings as to the effect of local activities on the interstate market before it regulates, *Raich*, 125 S. Ct. at 2208, it did so in enacting both the CSA and the statutes at issue here. *Compare id.* at 2203 n.20 (quoting findings that local drug possession affects interstate commerce), *with* Child Pornography Prevention Act of 1996, Pub. L. 104-208, 110 Stat. 3009-27 ("[P]rohibiting the possession and viewing of child pornography will . . . help[ ] to protect the victims of child pornography and to *eliminate the market* for the sexual exploitative use of children.") (emphasis added); *see also Buculei*, 262 F.3d at 329 ("[T]here are ample congressional findings to support the proposition that production and possession of child pornography substantially affect interstate commerce.").

In light of these similarities, we can only hold that *Raich* controls the present analysis.[2] As in *Raich*, the general regulatory scheme here governs "quintessentially economic" activities. *Raich*, 125 S. Ct. at 2211. Because Congress possessed a rational basis for concluding that the local production and possession of child pornography substantially affect interstate commerce, "the *de minimis* character of individual instances arising under the statute is of no consequence." *Id.* at 2206 (quoting *United States v. Lopez*, 514 U.S. 549, 558 (1995)). Accordingly, Forrest's constitutional challenge, which rests entirely on the asserted *de minimis* economic effect of his own activities, *see, e.g.*, Brief of Appellant at 8 ("Nothing about these child photographs implicated or affected interstate commerce."), must fail.

## III.

Forrest also appeals two evidentiary rulings. First, he claims the district court erred by admitting purportedly irrelevant and prejudicial photographs and computer images of adult males. Second, he argues the court erred by admitting unreliable and prejudicial expert testimony about the behavior patterns of child sexual predators. We review decisions to admit evidence for abuse of discretion. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 260 (4th Cir. 2005); *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993).

## A.

Forrest asserts that the district court erred in admitting several pornographic and nonpornographic photographs of adult males found in

---

[2]We note that the Supreme Court itself has suggested that *Raich* bears directly on the question at hand by vacating and remanding in light of *Raich* two cases sustaining Commerce Clause challenges to these child exploitation statutes. *See United States v. Smith*, 402 F.3d 1303 (11th Cir. 2005), *vacated and remanded*, 125 S. Ct. 2938 (2005); *United States v. Maxwell*, 386 F.3d 1042 (11th Cir. 2004), *vacated and remanded*, 74 U.S.L.W. 3171 (Oct 4, 2005) (No. 04-1382). The Solicitor General has also asked the Court to vacate and remand another Eleventh Circuit case in light of *Raich*. *See United States v. Matthews*, *petition for cert. filed*, 2005 WL 1609688 (July 8, 2005) (No. 05-59). That petition is still pending.

his photo album and on his home and office computers. He contends that because these photographs have "the effect of portraying Mr. Forrest as a homosexual, with the prejudice and possible connotation of a child molester as well," Brief of Appellant at 24, the district court should have excluded them under Federal Rule of Evidence 403.

That rule provides that a district court may exclude otherwise relevant evidence if its probative value is "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. A court does not abuse its discretion by refusing to exclude such evidence, however, unless there is "a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *Ham*, 998 F.2d at 1252 (quoting *United States v. Masters*, 622 F.2d 83, 87 (4th Cir. 1980) (internal quotation marks omitted)).

The district court did not abuse its discretion here. Even if we accept Forrest's premise that allegations of homosexuality were prejudicial, that prejudice was not disproportionate to the pictures' relevance. Forrest's defense theories made the images of adult males highly relevant. His attorney repeatedly argued that Forrest's ex-fiancee had "manufactured" the photo album. Alternatively, his counsel suggested several times that Forrest took the photographs of the victim in order to help him prepare a civil law suit against a jail stemming from an illegal strip-search during a field trip.

The images of adult males directly rebutted both theories. The images suggested that Forrest himself manufactured the album, because the same images of adult males in the album, bearing the "Rude Jam" website logo, existed on Forrest's home and office computers as well. The images' placement in the album also contradicted the notion that they were taken for innocent, investigatory purposes because Forrest inserted them in the album next to pictures showing the same region of the victim's anatomy.

Because these adult male images indicated that Forrest had created the album and that he did not possess entirely innocent purposes for so doing, they constituted important relevant evidence. *See* Fed. R. Evid. 401 ("'Relevant evidence' means having any tendency to make the existence of any fact that is of consequence . . . more probable or

less probable than it would be without the evidence."). Forrest has not established that the images' purported prejudicial effect was so severe that it substantially outweighed this relevance.[3]

B.

Forrest next asserts that the district court erred in admitting the expert testimony of Kenneth Lanning, who testified about the behavioral patterns of child sexual abusers.

A federal district court performs an important "gatekeeping" function in deciding whether to admit expert testimony under Federal Rule of Evidence 702. The court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). In assessing whether the expert testimony is reliable and relevant, a court should consider "(1) whether the particular scientific theory 'can be (and has been) tested'; (2) whether the theory 'has been subjected to peer review and publication'; (3) the 'known or potential rate of error'; (4) the 'existence and maintenance of standards controlling the technique's operation'; and (5) whether the technique has achieved 'general acceptance' in the relevant scientific or expert community." *United States v. Crisp*, 324 F.3d 261, 266 (4th Cir. 2003) (quoting *Daubert*). The same analysis applies where the expert testimony relates to matters of technical, rather than scientific, expertise. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

Forrest contends that the district court violated Rule 702 in admitting this expert testimony because it was neither reliable nor relevant. He also asserts the court violated Rule 403 because the testimony, which "portray[ed] [Forrest] as a child molester and Steven as his vic-

---

[3]The primary Fourth Circuit precedent on which Forrest relies — *United States v. Ham* — merely held that the defendant in a racketeering and mail fraud prosecution was unfairly prejudiced by "implications of child molestation, homosexuality, and abuse of women." *Ham*, 998 F.2d at 1252. The present case is very different; the images in question here are less prejudicial and substantially more relevant to the underlying charges than the materials at issue in *Ham*. Accordingly, *Ham* provides no support for Forrest.

tim," Brief of Appellant at 33, posed a risk of unfair prejudice that substantially outweighed its probative value.

The admission of this testimony is troubling. Even though Forrest was not on trial for sexual abuse, the court permitted Lanning to describe a general profile of a serial child molester that closely resembled Forrest's behavior. Lanning testified that child molesters are often authority figures, like police officers; that they often take pictures of the children they assault; that they have their child victims spend the night; that they use pornography to lower their victims' inhibitions; and that they are often discovered only after someone finds the pictures they have taken. Each of these hypothetical characteristics is present in this case and suggests that Forrest, too, might be a child molester.

We need not resolve whether admission of this expert testimony violated either Rule 403 or Rule 702, however. Even assuming its admission was error, that error was harmless. *See United States v. Jones*, 913 F.2d 174, 177 (4th Cir. 1990) (applying harmless error analysis to improper admission of expert testimony).

An error in admitting improper expert testimony is harmless if "viewing the record as a whole, it is 'clear beyond a reasonable doubt that the jury would have returned a verdict of guilty' absent the testimony." *Jones*, 913 U.S. at 177 (quoting *Alston v. Garrison*, 720 F.2d 812, 817 (4th Cir. 1983)). Clearly, on this record the jury would have found Forrest guilty even absent Lanning's testimony. It cannot be said that the mere suggestion Forrest might be a child molester affected the verdict given the direct evidence establishing that he had twice attempted to assault Steven. Moreover, the Government offered overwhelming evidence that Forrest committed the crimes for which the jury convicted him — production and possession of child pornography in violation of §§ 2251(a) and 2252A(a)(5)(B). *See Jones*, 913 F.2d at 177 ("In considering the harmlessness of the error, it is proper to consider other evidence of the defendant's guilt.") (quoting *United States v. Davis*, 657 F.2d 637, 640 (4th Cir. 1981) (internal quotation marks omitted). For these reasons, any error in admitting the expert testimony was harmless.

IV.

Finally, Forrest asserts that the district court erred in sentencing him. He bases his claim on *United States v. Booker*, 125 S. Ct. 738 (2005), in which the Supreme Court held that "the imposition of a sentence under the former mandatory guidelines regime" is error. *United States v. White*, 405 F.3d 208, 216 (4th Cir. 2005). Forrest's claim is not a pure *Booker* claim, however; instead, it derives from the interaction of *Booker* and this court's holding in *United States v. Rast*, 293 F.3d 735 (4th Cir. 2002).

In *Rast*, we interpreted some anomalous language in § 2251, which then provided that a defendant convicted under that provision shall "be fined under this title or imprisoned not less than 10 years nor more than 20 years, *and* both." 18 U.S.C. § 2251 (2000) (emphasis added).[4] We held that the language "must be the result of a drafting error," and should be read as "or both," instead of "and both." *Rast*, 293 F.3d at 737.

Forrest relies on a portion of the *Rast* opinion that suggests we would have remanded the case to the district court so that it could exercise discretion in deciding whether to impose a fine or a ten-year sentence, but for the fact that the Guidelines required some prison time. *See Rast*, 293 F.3d at 739. Finding that the then-mandatory Guidelines "foreclose[d] the option of imposing solely a fine," *id.* at 740, we affirmed the sentence. Forrest asserts this holding must be revisited in light of *Booker*. "Thus, Forrest challenges his sentence on the basis of a *Booker* claim once removed. He does not assert that the district court inappropriately applied a mandatory sentencing regime, but rather that it sentenced him to the statutorily prescribed ten-year term against the backdrop of *Rast*, which allegedly was infected with *Booker* error.

Because Forrest failed to raise this issue in the district court, we consider it only for plain error. *Hughes*, 401 F.3d at 547. As noted

---

[4]Congress amended this statute in 2003 in the PROTECT Act, Pub. L. 108-21 § 103(b)(1)(A). It now provides that a defendant convicted under section 2251 should receive both a fine and a mandatory minimum jail term. *See* 18 U.S.C.A. § 2251(e) (West Supp. 2005).

above, to succeed on the plain error analysis Forrest must demonstrate that an error occurred, that it was plain, that the error affected his substantial rights, and that failure to recognize it would be a miscarriage of justice. *Id.* at 547-48, 555.

Even if Forrest is correct that, as in *Rast*, the district court in this case felt compelled to give him a prison term because of the mandatory nature of the Guidelines, this does not, in itself, warrant reversal. Although it would be plain error to sentence Forrest to a prison term (as opposed to imposing a fine) solely because of the mandatory Guidelines regime, a court will not grant relief because of such error unless an appellant demonstrates that such an error affected his substantial rights. *See White*, 405 F.3d at 216-17. Forrest has not done that.

To make the required showing — that this alleged error affected his substantial rights — Forrest must do more than hypothesize that he might have received a different sentence if the judge knew the Guidelines were merely advisory; he must "demonstrate, based on the record, that the treatment of the Guidelines as mandatory caused the district court to impose a longer sentence than it otherwise would have imposed." *Id.* at 224. As we held in *Rast*, if the trial court imposes any imprisonment at all under § 2251, it must give a defendant at least ten years, 293 F.3d at 738; this was Forrest's actual sentence. Hence, Forrest would need to show that the district court would have imposed a fine on him in lieu of jail time had he been sentenced after *Booker* rendered the Guidelines advisory.

The record provides no nonspeculative basis for such a conclusion. If anything, it only confirms that the court would have sentenced Forrest to the ten-year statutory minimum jail term regardless of *Booker*. The district court noted that this was "a very, very serious offense" with many victims, including Steven, Forrest's family, and the City of Seat Pleasant. Moreover, although the court calculated the guideline range, nowhere did it state that it was the Guidelines, rather than the statutory term (which the court repeatedly mentioned), that mandated the ten-year sentence. Because Forrest bears the burden of proof on plain error review, his claim must fail.

## V.

For all these reasons, the judgment of the district court is

*AFFIRMED*.