# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 5, 2006          Decided June 27, 2006

No. 05-3161

UNITED STATES OF AMERICA,
APPELLEE

v.

ROGER JAMES SULLIVAN,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 04cr00082-01)

*Laina C. Wilk* argued the cause for appellant. With her on the briefs was *Thomas G. Corcoran, Jr.* *Herbert A. Dubin* entered an appearance.

*Suzanne C. Nyland*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Roy W. McLeese, III*, *Thomas J. Tourish, Jr.*, and *Barbara E. Kittay*, Assistant U.S. Attorneys.

Before: SENTELLE and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Circuit Judge* SENTELLE.

EDWARDS, *Senior Circuit Judge*:  Appellant Roger James Sullivan pled guilty to one count of knowingly possessing child pornography images that were transported in interstate commerce via the Internet, in violation of 18 U.S.C. § 2252A(a)(5)(B) (2000).  Appellant moved to have his indictment dismissed by the District Court, arguing that Congress lacked the power to proscribe purely intrastate possession of pornography, regardless of whether the pornography had traversed interstate over the Internet.  The District Court denied Sullivan's motion, holding that Congress acted within its authority under Article I, § 8 of the Constitution when it criminalized certain activities relating to material constituting or containing child pornography.

On appeal, Sullivan renews his constitutional claim.  We agree with the District Court that his argument fails.  The Supreme Court's decision in *Gonzales v. Raich*, 125 S. Ct. 2195 (2005), which was decided after the District Court's ruling, directly controls the disposition of this case.  We also reject appellant's objections to the conditions of his supervised release imposed by the District Court.

## I. BACKGROUND

Section 2252A(a)(5)(B) prohibits:

knowingly possess[ing] any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or

> shipped or transported in interstate or foreign commerce by any means, including by computer.

18 U.S.C. § 2252A(a)(5)(B) (2000). On February 19, 2004, appellant was indicted on one count of possession of ten or more items of child pornography that had been transported in interstate or foreign commerce by computer, in violation of § 2252A(a)(5)(B). In November 2004, Sullivan executed a plea agreement, which included a proffer of facts supporting a guilty plea on the § 2252A(a)(5)(B) charge; he then entered a conditional plea of guilty, preserving for appeal the issue of whether § 2252A(a)(5)(B), as applied to him, exceeded Congress' authority under the Commerce Clause.

The proffer of facts supporting the plea agreement is straightforward. In 2002, appellant was working for FOX News Productions in Washington, D.C. FOX is a broadcast and cable news network that produces and distributes news and information programs throughout the United States. In March 2002, the FBI received a telephone call from an employee at FOX, reporting that approximately 75,000 files of pornography had been found on the computer at appellant's workplace. The FBI retrieved the hard drive and "zip disks" from appellant's computer and found thousands of images of child pornography that had been downloaded from various Internet sites, through Usenet, located in Atlanta, Georgia, via the FOX News Internet provider, MCI UUNet, whose server is located in Herndon, Virginia. The National Center for Missing and Exploited Children analyzed the pornography and determined that many of the images were downloaded from Eastern European and Russian Internet sites. An officer from the United States Navy Center for Child Protection would have testified that, in her expert opinion, at least 24 of the images given to her for examination contained enough detail and content to determine that they depicted children who were under 18 years of age and four images depicted children who were prepubescent. An

expert in Forensic Audio, Video and Image Analysis from the FBI Laboratory would have testified that these images were taken from photographs of real children and were not artificially created.

Appellant admitted that he personally downloaded the images of child pornography from the Internet. He admitted that he knew it was illegal to download the imagines of child pornography from the Internet. He acknowledged that he had exclusive access to his computer, so no one else was involved in downloading the pornography to his computer. He also admitted that he had copied the contents of his hard drive to a substitute hard drive and that he had acquired the zip disks in order to move personal data, including the images of child pornography, from the hard drive of his workplace computer.

On December 8, 2004, Sullivan moved to dismiss the indictment on the ground that 18 U.S.C. § 2252A(a)(5)(B), as it applied to him, exceeded Congress' authority under the Commerce Clause. On December 22, the District Court convened a motions hearing and both parties offered arguments addressing the Eleventh Circuit's decision in *United States v. Maxwell*, 386 F.3d 1042 (11th Cir. 2004) ("*Maxwell I*"), which had held that Congress could not regulate intrastate possession of child pornography. *Maxwell I* was vacated and remanded by the Supreme Court in light of *Gonzales v. Raich*, *see United States v. Maxwell*, 126 S. Ct. 321 (2005) (mem), and subsequently overturned by the Eleventh Circuit, *see United States v. Maxwell*, 446 F.3d 1210 (11th Cir. 2006) ("*Maxwell II*").

Without the benefit of either *Raich* or *Maxwell II*, the District Court denied appellant's motion to dismiss the indictment. The court ruled that § 2252A(a)(5)(B) was constitutional as applied to Sullivan, because the images of child pornography were "instrumentalities" or "things" in interstate commerce and passed over the Internet, a "channel" of

interstate commerce, or, alternatively, because the conduct at issue – possession of child pornography – has a substantial relation to interstate commerce. In the trial court's view, Congress acted within its authority when it sought to limit the supply and demand for child pornography by targeting all participants in the illicit market:

> Congress intended to reach people who create this kind of material, and also people who are seeking it through whatever means, including through the Internet. People like Mr. Sullivan fuel the market for it.

Motions Tr. at 30.

Subsequently, on September 16, 2005, the District Court conducted a hearing to address issues related to appellant's sentence. After securing the parties' agreement that the Presentence Report ("PSR") contained no factual errors, the court went on to hear arguments regarding the proper sentence. The court explained that it would apply the 2002 Sentencing Guidelines, not the version currently in force, in order to give appellant the benefit of a lower base offense level. *See United States v. Bolla*, 346 F.3d 1148, 1151 n.1 (D.C. Cir. 2003) (discussing U.S.S.G. §§ 1B1.11(a) & 1B1.11(b)(1)). The parties presented arguments related mainly to Sullivan's psychological condition and the method of applying the Guidelines in light of *United States v. Booker*, 543 U.S. 220 (2005). The District Court then sentenced appellant to 30 months' imprisonment, to be followed by two years of supervised release. Three of the conditions of supervised release are at issue in this appeal:

> (1) The defendant shall not possess or use a computer that has access to any "on-line computer service" at any location, including his place of employment, without the prior written approval of the Probation Office. "On-line computer service" includes, but is not limited to, any

Internet service provider, bulletin board system, or any other public or private computer network.

. . .

(2) Without the approval of a legal guardian, the defendant shall have no direct, or indirect, contact with children, age 18 or younger, and shall refrain from loitering in any place where children congregate, including but not limited to residences, arcades, parks, playgrounds, and schools. He shall not reside with a child or children under the age of 18 without the expressed and written approval of the minor's legal guardian and the written permission of the Court.

(3) The defendant shall not possess any pornographic, sexually oriented, or sexually stimulating materials, including visual, auditory, telephonic, or electronic media, and/or computer programs or services that relevant [sic] to the offender's deviant behavior pattern. He shall not patronize any place where pornography or erotica can be accessed, obtained, or viewed, including establishment [sic] where sexual entertainment is available.

Judgment in a Criminal Case, *United States v. Sullivan*, CR 04-82 (D.D.C. 2005), at 3-4 (numbering added).

Appellant now renews his challenge to the indictment, maintaining that, as applied to him, § 2252A(a)(5)(B) represents an unconstitutional exercise of congressional power. He also challenges certain of the conditions of supervised release imposed by the District Court.

## II. ANALYSIS

### A. *The Constitutionality of Sullivan's Indictment*

Appellant makes the following argument in support of his appeal:

Title 18 U.S.C. § 2252A(a)(5)(B) is unconstitutional as applied to Sullivan because the statute exceeds Congress' authority pursuant to the Commerce Clause. In [*United States v. Lopez*, 514 U.S. 549, 558 (1995)], the Supreme Court identified three areas that Congress could regulate pursuant to the Commerce Clause: 1) the channels of interstate commerce; 2) the instrumentalities of interstate commerce; and 3) conduct that substantially affects interstate commerce. 514 U.S. at 558-59. As case authority shows, the conduct regulated here – possession – is a purely intrastate activity, and therefore if it may be regulated at all, it can be regulated only pursuant to the third *Lopez* category. . . . Congress cannot regulate Sullivan's conduct pursuant to the third *Lopez* category because the conduct did not substantially affect interstate commerce.

Appellant's Br. at 11-12. The problem with this argument is that it completely ignores the Court's decision in *Gonzales v. Raich*.

The question before the Court in *Raich* was "whether the power vested in Congress by Article I, § 8, of the Constitution '[t]o make all Laws which shall be necessary and proper for carrying into Execution' its authority to 'regulate Commerce with foreign Nations, and among the several States' includes the power to prohibit the local cultivation and use of marijuana in compliance with California law." 125 S. Ct. at 2199. In answering this question in the affirmative, the Court tellingly noted:

Our case law firmly establishes Congress' power to regulate purely local activities that are part of an economic "class of activities" that have a substantial effect on interstate commerce. *See, e.g.*, [*Perez v. United States*, 402 U.S. 146, 151 (1971)]; *Wickard v. Filburn*, 317 U.S. 111, 128-129 (1942). As we stated in *Wickard*, "even if appellee's activity be local and though it may not be regarded as

> commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce." *Id.*, at 125. We have never required Congress to legislate with scientific exactitude. When Congress decides that the "'total incidence'" of a practice poses a threat to a national market, it may regulate the entire class.

*Id.* at 2205-06. Careful review of the Court's decision in *Raich* makes it clear to us that the holding there controls the disposition of this case. If, under *Raich*, Congress may criminalize purely intrastate production and use of marijuana, it follows here that it may criminalize possession of child pornography that has been transmitted through multiple states via the Internet.

Under federal law, marijuana is classified as a Schedule I drug, 21 U.S.C. § 812(c), and its use is therefore illegal, *id.* §§ 841(a)(1), 844(a), with a very limited exception for research uses, *id.* § 823(f). California's Compassionate Use Act, however, allowed certain patients with a doctor's approval to cultivate, possess, and consume marijuana. *Raich,* 125 S. Ct. at 2199. The plaintiffs in *Raich* included "California residents who suffer[ed] from a variety of serious medical conditions and . . . sought to avail themselves of medical marijuana pursuant to the terms of the Compassionate Use Act." *Id.* at 2199-2200. They were under the care of licensed, board-certified family practitioners, who had concluded that marijuana was the only drug available that would give these parties effective treatment. *Id.* at 2200. When it was determined that their possession and use of marijuana violated federal law, the *Raich* plaintiffs brought suit against the Attorney General seeking injunctive and declaratory relief prohibiting the enforcement of the Controlled Substances Act ("CSA") insofar as it abrogated their rights under the Compassionate Use Act. As noted above, the only issue before the Court in *Raich* was whether Congress could

criminalize intrastate possession and use of marijuana. Significantly, the *Raich* plaintiffs did not attack the provisions of the CSA on their face, but mounted only an as-applied challenge. *See id.* at 2204-05. Despite the narrowness of the challenge, the Court found no constitutional defect in the Government's enforcement of federal drug law.

In support of the proposition that Congress had "power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce," *id*. at 2205, the Court described the evolution of the Commerce Clause:

> As charted in considerable detail in *United States v. Lopez*, our understanding of the reach of the Commerce Clause, as well as Congress' assertion of authority thereunder, has evolved over time. The Commerce Clause emerged as the Framers' response to the central problem giving rise to the Constitution itself: the absence of any federal commerce power under the Articles of Confederation. For the first century of our history, the primary use of the Clause was to preclude the kind of discriminatory state legislation that had once been permissible. Then, in response to rapid industrial development and an increasingly interdependent national economy, Congress "ushered in a new era of federal regulation under the commerce power," beginning with the enactment of the Interstate Commerce Act in 1887, 24 Stat. 379, and the Sherman Antitrust Act in 1890, 26 Stat. 209, as amended, 15 U.S.C. § 2 *et seq.*
>
> Cases decided during that "new era," which now spans more than a century, have identified three general categories of regulation in which Congress is authorized to engage under its commerce power. First, Congress can regulate the channels of interstate commerce. *Perez v. United States*, 402 U.S. 146, 150 (1971). Second, Congress has authority to regulate and protect the instrumentalities of

> interstate commerce, and persons or things in interstate commerce. *Ibid*. Third, Congress has the power to regulate activities that substantially affect interstate commerce. *Ibid*.; *NLRB v. Jones & Laughlin Steel Corp*., 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

*Id*. at 2205 (footnotes omitted). The Court then noted that only the third category – regulation of activities that substantially affect interstate commerce – was at issue in the case. *Id*.

In amplifying this third category, the *Raich* Court focused on its decision in *Wickard v. Filburn*, 317 U.S. 111 (1942), which had held that Congress' interstate commerce authority allowed it to regulate the production of wheat intended for personal consumption on a farm. Central to the Court's analysis in *Wickard* was the premise that even if the effect of homegrown wheat on interstate commerce was trivial, it remained within the ambit of congressional authority. *See Wickard*, 317 U.S. at 127-28. The *Raich* Court found that the "similarities between this case and *Wickard* are striking." 125 S. Ct. at 2206. Both cases involved the cultivation, "for home consumption, [of] a fungible commodity for which there is an established" interstate market. *Id*. And "[j]ust as the Agricultural Adjustment Act [in *Wickard*] was designed 'to control the volume [of wheat] moving in interstate and foreign commerce in order to avoid surpluses . . .' and consequently control the market price, a primary purpose of the CSA [in *Raich*] is to control the supply and demand of controlled substances in both lawful and unlawful drug markets." *Id*. at 2206-07 (third and fourth alterations in original) (internal citations omitted). The Court thus concluded that "Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would . . . affect price and market conditions," especially given the risk of illicit diversion of homegrown marijuana into the interstate market. *Id*. at 2207.

The Court in *Raich* then stated the applicable test for assessing the scope of Congress' authority under the Commerce Clause to enact comprehensive legislation:

> [W]e stress that the task before us is a modest one. We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a "rational basis" exists for so concluding.

*Id.* at 2208. Applying this test, the Court held that,

> [g]iven the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere . . . and concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA. Thus, as in *Wickard*, when it enacted comprehensive legislation to regulate the interstate market in a fungible commodity, Congress was acting well within its authority to "make all Laws which shall be necessary and proper" to "regulate Commerce . . . among the several States." U.S. Const., Art. I, § 8. That the regulation ensnares some purely intrastate activity is of no moment. As we have done many times before, we refuse to excise individual components of that larger scheme.

*Id.* at 2209 (footnote omitted and second ellipsis in original).

Applying this test to facts of this case, we must conclude that Congress was acting well within its authority under Article I, § 8 – *i.e.*, "to regulate activities that substantially affect interstate commerce," *Raich*, 125 S. Ct. at 2205 – in criminalizing possession of child pornography transmitted through several states via the Internet. The prohibition against possessing child pornography transported in interstate commerce

by computer is one important aspect of a comprehensive legislative scheme aimed at eliminating traffic in child pornography. Section 2252A(a)(5)(B), which is at issue in this case, was enacted as part of the Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, §121(3), 110 Stat. 3009, 3009-28 (1996) (the "CPPA"). The regulatory scheme enacted by Congress to deal with child pornography prohibits: exploiting children by producing child pornography using materials in interstate commerce, 18 U.S.C. § 2251 (2000); transporting, shipping, or receiving depictions of child pornography in foreign or interstate commerce, *id.* § 2252; producing or exporting child pornography abroad with the intent that it enter the United States, *id.* § 2260; and possessing child pornography that has traveled in interstate commerce, *id.* § 2252A. The statute also subjects property used in child pornography offenses to criminal and civil forfeiture provisions. *Id.* §§ 2253-2254.

Like the illicit drug networks motivating passage of the CSA, the trade in child pornography is "quintessentially economic." *See Raich*, 125 S. Ct. at 2211. The Court explained that "economics" refers to "the production, distribution, and consumption of commodities." *Id.* at 2211 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 720 (1966)). The activities targeted by Congress in its anti-child pornography legislation clearly fit this definition. Like marijuana, child pornography is "a fungible commodity for which there is an established, albeit illegal, interstate market." *Id.* at 2206. Controlling the trade of child pornography thus requires regulation of the illicit marketplace. Intrastate possession of digital child pornography is susceptible to "diversion" into interstate markets, at least as much as marijuana. Accordingly, the Government's efforts to control the illicit marketplace by limiting supply and demand is facilitated by regulation of intrastate possession of child pornography.

Indeed, the economic effects in this case appear to be even more compelling than those in *Raich* or *Wickard*. In contrast to wheat or marijuana, the supply of electronic images of child pornography has a viral character: every time one user downloads an image, he simultaneously produces a duplicate version of that image. Transfers of wheat or marijuana merely subdivide an existing cache; transfers of digital pornography, on the other hand, multiply the existing supply of the commodity, so that even if the initial possessor's holdings are destroyed, subsequent possessors may further propagate the images. This means that each new possessor increases the available supply of pornographic images. This multiplying effect highlights the importance of eliminating a possessor's stash in the first instance, before it can be disseminated into the marketplace.

As Congress noted in the findings attached to the CPPA, "prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to *eliminate the market* for the sexual exploitative use of children." Pub. L. No. 104-208, § 121(1)(12), 110 Stat. at 3009-27 (emphasis added). In *Wickard*, the Court recognized that the congressional objective of controlling the market for wheat by regulating its price "can be accomplished as effectively by sustaining or increasing the demand as by limiting supply," including the homegrown supply consumed by farmers. 317 U.S. at 127-28. Criminalizing possession of child pornography likewise increases the "price" of pornography by attaching the risk of prosecution, a market intervention meant to eliminate the illicit trade.

In sum, following *Raich*, we find that a rational basis exists for believing that failure to regulate the intrastate possession of child pornography that has been "transported in interstate or foreign commerce . . . by computer," s*ee* 18 U.S.C. § 2252A(a)(5)(B), would leave a significant gap in Congress'

comprehensive efforts to eliminate the market for sexually exploitative uses of children. That the application of § 2252A(a)(5)(B) might "ensare[] some purely intrastate activity is of no moment." *Raich*, 125 S. Ct. at 2209. Congress legitimately identified a national problem that is quintessentially economic, *i.e.*, it involves the manufacture and distribution of a commodity subject to the forces of supply and demand. To ameliorate that problem, Congress intervened in an illicit marketplace. Because it could rationally conclude that intrastate possession of child pornography has an effect on those market forces, it acted within its authority in proscribing possession. Both the holding and reasoning of *Raich* apply easily to this case.

It is noteworthy that *every* appellate court that has considered this question post-*Raich* has reached the same conclusion that we reach today. In *Maxwell II*, the Eleventh Circuit was able to "find very little to distinguish constitutionally Maxwell's claim from Raich's." *Maxwell II*, 446 F.3d at 1216 (footnote omitted). Following the Court's analysis in *Raich*, the *Maxwell II* court determined that "the CPPA is part of a comprehensive regulatory scheme criminalizing the receipt, distribution, sale, production, possession, solicitation and advertisement of child pornography." *Id.* at 1216-17. The court therefore reversed its earlier course and upheld Maxwell's conviction. The Fourth Circuit likewise rejected an as-applied challenge to § 2252A(a)(5)(B) in *United States v. Forrest*, 429 F.3d 73 (4th Cir. 2005). Having found the case before it "strikingly similar to *Raich*," the court explained that "in both instances Congress had a rational basis for concluding that prohibition of mere local possession of the commodity was essential to the regulation of 'an established, albeit illegal, interstate market.'" *Id.* at 78 (quoting *Raich*, 125 S. Ct. at 2206). Finally, the Tenth Circuit has twice invoked *Raich* in rejecting similar attacks on § 2251's prohibition against producing child pornography using materials

that have been shipped in interstate commerce, *United States v. Grimmett*, 439 F.3d 1263 (10th Cir. 2006); *United States v. Jeronimo-Bautista*, 425 F.3d 1266 (10th Cir. 2005), and the Sixth Circuit has cited *Raich* in rebuffing an attack on § 2252(a)(1), *United States v. Chambers*, 441 F.3d 438 (6th Cir. 2006). Applying the principles set forth in *Raich*, we, too, are constrained to reject the constitutional challenge to § 2252A(a)(5)(B).

## B. *The Terms of Supervised Release*

Sullivan also challenges the conditions of supervised release, focusing on the conditions that (1) restrict his use of computer and Internet services, (2) require him to have approval from the Probation Office before having any contact with minors, and (3) forbid his possession of "sexually stimulating material" and video equipment. He asserts that these conditions were unlawfully imposed, because they were not listed as suggested conditions of release in either the 2002 Sentencing Guidelines or the PSR and he received no other advance notice that the court might impose them, as allegedly required by Federal Rule of Criminal Procedure 32(i)(1)(C). Appellant also contends that the conditions are inconsistent with the statutory factors listed in 18 U.S.C. § 3553(a) (2000), which the court was bound to consider in issuing non-mandatory (or "special") terms of supervised release, *see id*. § 3583(d), and that the District Court never "substantiated" the need for the disputed conditions. Applying the applicable plain error standard of review, we find none of these arguments persuasive.

Our analysis of appellant's sentencing arguments turns on his failure to lodge any objections with the District Court. Appellant and his counsel stood in the sentencing judge's presence, listened to the specific terms of the sentence, and yet voiced no objections to any alleged lack of advance notice or opportunity to comment on the proposed conditions, or to the substance of the terms of supervised release. When a defendant

fails to raise a timely objection with the District Court, we review arguments introduced on appeal for plain error. *United States v. Simpson*, 430 F.3d 1177, 1183 (D.C. Cir. 2005). To prevail, an appellant must show that the District Court committed (1) a legal error that was (2) "plain" (a term that is synonymous with "clear" or "obvious"), and that (3) affected the appellant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732-34 (1993). If all three conditions are met, we retain discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 735-36.

Appellant first contends that, because the challenged conditions of supervised release were not listed as mandatory or discretionary conditions in the applicable Sentencing Guidelines, the District Court's imposition of the conditions *sua sponte* violated Rule 32. Under Rule 32, a sentencing court "must allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence." FED. R. CRIM. P. 32(i)(1)(C). Imposing conditions that were never forecast to a defendant, appellant argues, runs afoul of this requirement. We need not decide this question, because even if it was *error* for the District Court to impose the disputed conditions without giving advance notice to Sullivan, it most certainly was not reversible error under the plain error rule.

Sullivan's argument that the District Court committed error in failing to give him advance notice of the conditions of supervised release rests on a purported analogy to *Burns v. United States*, 501 U.S. 129 (1991). The Court in *Burns* held that, "before a district court can depart upward on a ground not identified as a ground for upward departure either in the presentence report or in a prehearing submission by the Government, Rule 32 requires that the district court give the parties reasonable notice that it is contemplating such a ruling.

This notice must specifically identify the ground on which the district court is contemplating an upward departure." *Id.* at 138-39. As the Court explained, "it makes no sense to impute to Congress an intent that a defendant have the right *to comment* on the appropriateness of a *sua sponte* departure but not the right *to be notified* that the court is contemplating such a ruling." *Id.* at 135-36. Importantly, the Court made it clear that, "[b]ecause the question of the *timing* of the reasonable notice required by Rule 32 is not before us, we express no opinion on that issue. Rather, we leave it to the lower courts, which, of course, remain free to adopt appropriate procedures by local rule." *Id.* at 139 n.6. It is also significant that the *Burns* decision does not involve an application of the plain error rule. Appellant apparently recognizes that *Burns* does not control the disposition of this case. Nonetheless, appellant invites us to broadly embrace the logic of *Burns* in a case in which review is controlled by the plain error standard. We decline the invitation.

In support of his position, appellant invokes *United States v. Wise*, 391 F.3d 1027 (9th Cir. 2004), in which the Ninth Circuit reversed conditions of supervised release that restricted the defendant's contact with children (including her own), and prohibited her from possessing pornography or sexually stimulating material. *Id.* at 1030-31. The court ruled that notice was a necessary antecedent to those restrictions, and that it is not enough "first to impose the sentence, and then to invite counsel to comment, *at least where counsel objects* as occurred here." *Id.* at 1033 (emphasis added). The instant case is quite different from *Wise*, because the appellant here did not raise an objection with the District Court. If appellant's counsel had objected, he could have sought more time to prepare an adequate response. If that request had been denied, we would have been in a position to decide whether to embrace the reasoning of *Wise*.

The Tenth Circuit has applied the principles of *Burns* in connection with a matter involving supervised release in *United*

*States v. Bartsma*, 198 F.3d 1191, 1994 (10th Cir. 1999). The defendant there pled guilty to possession of a firearm by a convicted felon and was required, as a condition of supervised release, to register as a sex offender because his criminal history, among other things, reflected prior convictions for rape and child molestation. Although the defendant did not object to this condition until the case was heard on appeal, the court nonetheless held that "the *Burns* rationale applies when a district court is considering imposing a sex offender registration requirement as a special condition of supervised release, and the condition is not on its face related to the offense charged." *Id.* at 1199-1200. The Tenth Circuit evidently was concerned about the glaring disjunction between the crime of conviction and the nature of the conditions of release. Indeed, the court expressly disclaimed any intent to "create a rule . . . requiring notice prior to the imposition of every special condition of supervised release," restricting its holding to "the unique facts" of the case it decided. *Id.* at 1200 n.7. The instant case does not involve a disjunction between the crime and the conditions of release, so *Bartsma* gives little support to appellant's position.

Finally, the Fifth Circuit has held that, under Rule 32 and *Burns*, a defendant who is subject to sex-offender conditions is entitled to receive notice in advance of sentencing that such conditions are under consideration. *United States v. Coenen*, 135 F.3d 938, 943 (5th Cir. 1998). However, defense counsel in *Coenen* objected when the sentence was pronounced and thus preserved the issue for appeal. *Id.* at 941.

In this case, defense counsel's failure to disclose any misgivings about the absence of pre-sentencing notice forecloses appellant's claim of plain error. At least two other courts reviewing similar challenges for plain error have rejected attempts to apply Rule 32's notice strictures in this context. *See United States v. Ristine*, 335 F.3d 692, 694 (8th Cir. 2003); *United States v. Brown*, 235 F.3d 2 (1st Cir. 2000). In our view,

when, as here, a defendant is provided with an opportunity to articulate his position and then stands by as the court announces its determination without interposing any objection, we can find no threat to the integrity, fairness, or public reputation of judicial proceedings justifying reversal on grounds of plain error.

Appellant urges us to review the substantive validity of the terms of supervised release for abuse of discretion. He acknowledges that, "[g]enerally, where a sentencing court affords the defendant an opportunity to object to the special conditions but the defendant remains silent, an appellate court reviews for plain error under Fed. R. Crim. P. 52(b)." Appellant's Br. at 47. Appellant contends, however, that where "a court imposes a special condition *after* resolving objections to the PSR and *after* permitting defendant to make a statement, the defendant has no meaningful opportunity to comment." *Id.* at 47-48. Appellant argues that, "[i]n that instance, the attack on the special condition is not waived by the defendant's failure to assert it below, and the abuse of discretion standard applies." *Id.* at 48. We reject this argument. There is neither compelling legal authority nor good reason for such a rule. The proper standard of review here is plain error.

As noted above, once appellant was made aware of the conditions that the District Court intended to impose, his counsel was in a position to respond or to seek additional time in which to formulate a response. Standing mute is not an option, not if a litigant wishes to avoid a plain error standard of review on appeal. This case does not involve a situation in which the defendant was barred from speaking, objecting, or seeking more time after the District Court judge made clear what he had in mind with respect to conditions of supervised release. On this record, we agree with the holding in *Ristine*, rejecting the appellant's claim there that "we should use an abuse of discretion standard, and not plain error, because [the

defendant's] failure to object stemmed from his lack of notice that the challenged conditions would be imposed." 335 F.3d at 694. The absence of an objection in this case means that we review appellant's claim for plain error, and we find none.

Normally, in reviewing conditions of supervised release under the abuse of discretion standard, the appellate court considers how the trial court measured the conditions imposed against the statutorily enumerated sentencing goals. The decision in *United States v. Stanfield*, 360 F.3d 1346 (D.C. Cir. 2004), describes what is entailed:

> The imposition of a term of supervised release after imprisonment is authorized by 18 U.S.C. § 3583. Subsection (d) of that provision specifies that the court may order any condition of supervised release "it considers to be appropriate," to the extent the condition is "reasonably related" to the nature and circumstances of the offense and the history and characteristics of the defendant, and to the need to deter crime, to protect the public from further crimes of the defendant, and to provide needed training, medical care, or other correctional treatment to the defendant. The condition also must entail "no greater deprivation of liberty than is reasonably necessary" to provide adequate deterrence, to protect the public, and to meet the defendant's vocational and medical needs.

*Id.* at 1352-53 (internal citations omitted). In applying these standards, "sentencing judges are afforded wide discretion when imposing terms and conditions of supervised release." *United States v. Henkel*, 358 F.3d 1013, 1014 (8th Cir. 2004).

In this case, appellant challenges the conditions of supervised release relating to the computer restrictions, the prohibition against contact with minors, the restrictions on sexually stimulating materials, and the ban on cameras and video recording devices. None of these conditions is so plainly

out of sync with the statutory goals enumerated in § 3553(a) as to warrant reversal under a plain error standard of review.

First, in cases involving prosecution for "sex crimes" – which is defined to include appellant's offense – restrictions on computer and Internet service are explicitly contemplated in the 2004 Sentencing Guidelines, which were in effect when Sullivan's sentence was determined. U.S.S.G. § 5D1.3(d)(7) (2004). While that version of the Guidelines did not govern appellant's sentencing, it certainly suggests that computer restrictions can be "reasonably related" to Sullivan's offense conduct. Moreover, no precedent in this circuit provided good reason to deny the validity of such a restriction. Appellant points to *Stanfield*, but that case does not cast doubt on the sentence at issue here. Reviewing a broad and confusing Internet restriction, we remanded the case "to allow the district court to clarify the scope of the restriction." 360 F.3d at 1354. But in *Stanfield*, the defendant had filed a motion with the trial court to clarify the restriction. *Id.* at 1351-52. The record in this case, as we have shown, is quite different.

This circuit has yet to decide whether individuals convicted of sex crimes may have their Internet usage conditioned on Probation Office approval, and our sister circuits are divided on the issue. *Compare United States v. Rearden*, 349 F.3d 608, 621 (9th Cir. 2003) (upholding Internet restriction), *and United States v. Zinn*, 321 F.3d 1084, 1093 (11th Cir. 2003) (same)*, with United States v. Crume*, 422 F.3d 728, 733 (8th Cir. 2005) (reversing Internet restriction), *and United States v. Sofsky*, 287 F.3d 122, 126 (2nd Cir. 2002) (same). This division among the circuits, coupled with the indication in the Sentencing Guidelines that some measure of Internet restriction is appropriate in cases like this one, commands our conclusion that the trial court committed no *plain error*.

Sullivan's other challenges to the validity of his terms of supervised release are also meritless. He points to no D.C.

Circuit authority that is even arguably inconsistent with any of the remaining restrictions. We are thus satisfied that none of the conditions that he challenges warrants reversal.

Nor do we find any merit in Sullivan's terse contention that his sentence is flawed because the District Court failed to "substantiate" the terms of supervised release. As with the other sentencing issues we have discussed, Sullivan and his counsel sat in court while the judge pronounced the sentence, but they never voiced an objection on the ground that the District Court had failed to substantiate the conditions of release that were imposed. And appellant has offered no viable basis for ascribing plain error to the trial court on this issue.

In the end, we can find no plain error with respect to appellant's belated objection to his sentencing conditions. There is no indication here that appellant's substantial rights have been affected, *see United States v. Baugham,* ___ F.3d ___, 2006 WL 1506859, at *14 (D.C. Cir. 2006) (appellant must "'make a specific showing of prejudice,' *i.e.*, show that the error 'affected the outcome of the district court proceedings'") (quoting *Olano*, 507 U.S. at 735)), because there is no showing here that the judge would have imposed less onerous conditions even if appellant had been afforded "advance" notice. *Cf. United States v. McKissic*, 428 F.3d 719, 726 (7th Cir. 2005) ("It did not 'affect substantial rights' because [appellant] can seek modification of the conditions.").

## III. Conclusion

For the reasons given above, the judgment of the District Court is hereby affirmed.

*So ordered.*

SENTELLE, *Circuit Judge*, concurring:   I join without reservation the majority's disposition of the sentencing issues as set forth in Part II.B. of the majority opinion.  I write separately as to the merits disposition expressed in Part II.A., not because I consider the majority's opinion to be in error, but to express my concern about what appears to me to be a confused area of constitutional law.  I wholly agree with appellant's argument that

> Title 18 U.S.C. § 2252A(a)(5)(B) is unconstitutional as applied to Sullivan because the statute exceeds Congress' authority pursuant to the Commerce Clause.  In [*United States v. Lopez*, 514 U.S. 549 (1995)], the Supreme Court identified three areas that Congress could regulate pursuant to the Commerce Clause:   1) the channels of interstate commerce; 2) the instrumentalities of interstate commerce; and 3) conduct that substantially affects interstate commerce.  514 U.S. at 558-59.  As case authority shows, the conduct regulated here – possession – is a purely intrastate activity, and therefore if it may be regulated at all, it can be regulated only pursuant to the third *Lopez* category . . . .  Congress cannot regulate Sullivan's conduct pursuant to the third *Lopez* category because the conduct did not substantially affect interstate commerce.

Appellant's Br. at 11-12.  I would, therefore, vote to reverse appellant's conviction were it not for the intervening Supreme Court decision in *Gonzales v. Raich*, 125 S. Ct. 2195 (2005).  With some reluctance, I join the majority's decision that the latest Supreme Court opinion compels affirmance of this conviction.   But my reluctance arises from the apparent inconsistency of *Raich* with *Lopez*.

As appellant's argument properly points out, *Lopez* limited the reach of the Commerce Clause to three categories. The first two are plainly not implicated by appellant's conduct. Therefore, for the federal government to constitutionally regulate that conduct, it must fall within the category of "activities having a substantial relationship to interstate commerce . . . *i.e.*, those activities that substantially affect interstate commerce . . . ." *Lopez*, 514 U.S. at 558-59 (citations omitted). I am at a loss as to how purely intrastate possession of a product that has previously traveled interstate substantially affects interstate commerce. In analyzing the constitutionality of regulation under category three, the Supreme Court in *Lopez* undertook a further analysis which, in the absence of the *Raich* opinion, would govern our adjudication of the question before us. *See id.*, 514 U.S. at 559-65. That analysis generally covers the following three elements:

– the regulation controls a commercial activity, or an activity necessary to the regulation of some commercial activity;

– the statute includes a jurisdictional nexus requirement to ensure that each regulated instance of the activity affects interstate commerce; and

– the rationale offered to support the constitutionality of the statute (*i.e.*, statutory findings, legislative history, arguments of counsel, or a reviewing court's own attribution of purposes to the statute being challenged) has a logical stopping point, so that the rationale is not so broad as to regulate on a similar basis all human endeavors, especially those traditionally regulated by the states.[1]

---

[1]This specific formulation of the inquiries necessary under category (3) is drawn from *United States v. Wall*, 92 F.3d 1444, 1455-

It is not at all plain to me that the present conduct falls within any of the three analytical elements. First, it is not clear that regulation of purely intrastate possession of a product is necessary to the regulation of the commercial activity which Congress seeks to regulate. Second, there is no relevant jurisdictional section. Third, if the purely intrastate and noncommercial possession of a product is regulable simply because some of the product may have previously passed in interstate commerce, then I see no stopping point.

In the end, however, I cannot fault the majority's application of the later decision in *Raich*. I can, however, hope that the High Court in some further decision gives us some better method of reconciling its holdings on the extent of congressional power under the Interstate Commerce Clause.

---

56 (6th Cir. 1996) (Boggs, J., dissenting in part). However, each of the points summarized in Judge Boggs's formulation is taken directly from *Lopez*, 514 U.S. at 559-65. *See also Nat'l Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041, 1064 (D.C. Cir. 1997) (Sentelle, J., dissenting).