Opinion for the Court filed by Senior Circuit Judge SILBERMAN, with whom Senior Circuit Judge EDWARDS concurs.
Concurring opinion filed by Senior Circuit Judge EDWARDS.
Opinion dissenting as to jurisdiction and not deciding the merits filed by Circuit Judge KAVANAUGH.
SILBERMAN, Senior Circuit Judge:
The district court rejected appellants’ challenge to the Patient Protection and Affordable Care Act. They appeal. Despite questions raised as to our subject matter jurisdiction, we conclude we have jurisdiction, and we affirm the district court’s conclusion that the Act is constitutional.
I.
Since so much has already been written by our sister circuits about the issues presented by this case — which will almost surely be decided by the Supreme Court— we shall be sparing in adding to the production of paper.
Suffice it to say that the Affordable Care Act sought to reform our nation’s health insurance and health care delivery markets with the aims of improving access to those markets and reducing health care costs and uncompensated care. Other courts of appeals have described its provisions at length. See Thomas More Law Ctr. v. Obama, 651 F.3d 529, 534-35 (6th Cir.2011); Florida v. U.S. Dep’t of Health and Human Servs., 648 F.3d 1235, 1249-62 (11th Cir.2011).
This suit, like others, involves a challenge to the “minimum essential coverage provision,” which requires all “applicable individualfs]” to purchase and maintain “minimum essential coverage” — i.e., required essential health benefits in an insurance plan — for each month beginning in January 2014. This requirement is commonly called the “individual mandate.” Any “taxpayer” who “fails to meet the requirement” must pay a “shared responsibility payment,” labeled a “penalty,” which will be calculated by using the lesser of either a percentage of the taxpayer’s income or the national average premium for the lowest-level plan providing “minimum essential coverage.”[1]
Congress made specific findings why, in its judgment, the individual mandate regulates commerce.[2] Congress determined that decisions about whether and when to purchase health insurance, and how to pay for health care services, are inherently economic. And Congress found that without the mandate, uninsured individuals, in the aggregate, would consume costly health care services and pass on those costs to other market participants. Without the mandate, in Congress’s view, other reforms — namely prohibitions on denying health insurance coverage to individuals with pre-existing medical conditions (the “guaranteed issue requirement”) or using an individual’s medical history to justify higher insurance premiums (the “community rating requirement”) — would increase average premiums, exacerbate adverse selection problems, and discourage individuals from obtaining coverage until they were sick.
*5 Appellants, four United States citizens and federal taxpayers, seek declaratory and injunctive relief to prevent various U.S. Government officials and agencies from enforcing the minimum essential coverage provisions. They argue that the mandate exceeds Congress’s authority under the Commerce Clause and substantially burdens appellants Susan Seven-Sky’s and Charles Edward Lee’s religious exercise, in violation of the Religious Freedom Restoration Act.[3]
The district court granted the Government’s motion to dismiss. It upheld the minimum essential coverage provisions under the Commerce Clause and the Necessary and Proper Clause as a regulation of economic activity that substantially affects the health insurance and health care markets and as an essential element of a broader regulatory scheme. Mead v. Holder, 766 F.Supp.2d 16, 33-35 (D.D.C.2011). It also rejected appellants’ Religious Freedom Restoration Act claim.[4] Id. at 42-43.
Appellants filed a timely appeal. We affirm.
II.
At the outset, we are obliged to consider whether we have jurisdiction over this case. It is argued by one amicus[5] that the Anti — Injunction Act — which states, with some exceptions, that “no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person”— restrains us from entertaining the merits of this suit.[6] Indeed, the Fourth Circuit has recently held as much. See Liberty Univ., Inc. v. Geithner, — F.3d —, — (4th Cir.2011). According to our sister circuit, no suits to challenge the individual mandate or the penalty can be brought until the mandate comes into effect in 2014, plaintiffs fail to comply, the IRS imposes a penalty, and plaintiffs bring a refund action against the IRS. See id. at -. Although both appellants and the Government — the parties to this case — insist we do have jurisdiction, we, of course, have an independent duty to examine that question, see Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), and we have previously recognized that the Anti-Injunction Act is a limitation on our subject-matter jurisdiction, see Gardner v. United States, 211 F.3d 1305, 1311 (D.C.Cir.2000).
The jurisdictional issue brings two interrelated questions. First, whether the Anti-Injunction Act itself, by using the words “any tax,” applies to the shared responsibility payment. Second — even if the Anti-Injunction Act does not apply with its own force — does the Affordable Care Act invoke it by stating that the shared responsibility payment is to be “assessed and collected in the same manner” as penalties that are subject to the Anti-Injunction Act.
The Anti-Injunction Act, a part of the Internal Revenue Code, only bars preenforcement challenges to the assessment and collection of taxes. As is well known, *6 Congress, in passing the Affordable Care Act, pointedly rejected proposals to designate the shared responsibility payment as a “tax,” instead labeling it a “penalty.”[7] That Congress called numerous other provisions in the Act “taxes” indicates that its decision to use the word “penalty” here was deliberate.[8] And congressional findings never suggested that Congress’s purpose was to raise revenue. The Government estimates the penalty would raise $4 billion, but congressional findings emphasize that the aim of the shared responsibility payment is to encourage everyone to purchase insurance; the goal is universal coverage, not revenues from penalties.[9] Though the shared responsibility payment penalty is codified as part of the Internal Revenue Code, Congress prohibited the IRS from using traditional criminal enforcement or levying powers to collect the payment.[10] Covered persons have a legal obligation to purchase minimum coverage, but it is rather obvious that this provision’s success depends, much more than a typical tax obligation, on voluntary compliance.
The key question, therefore, is whether Congress intended the term “any tax” in the Anti-Injunction Act to sweep beyond exactions that Congress designated as “taxes” elsewhere in the Internal Revenue Code. The Fourth Circuit is of the view that “any tax” includes any exaction collected by the IRS, even if Congress called it a “penalty.” Liberty Univ., — F.3d at —. We disagree. Both the Anti-Injunction Act and the shared responsibility payment are part of the Internal Revenue Code. When Congress uses the same word — here, “tax” — in the same context, we presume Congress intends the same meaning throughout. See Erlenbaugh v. United States, 409 U.S. 239, 243-44, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972). And when Congress wants a “tax” in one statute to include more than the exactions it labels taxes in other statutes, it says so. For instance, a “tax” under the Bankruptcy Code means anything that functions like a tax, not just anything Congress labeled a “tax,” only because Congress directed that terms used in the Bankruptcy Code shall have special meanings. United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213, 219-20, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996). By analogy, if Congress says that a sum owed at customs is not a penalty, that designation controls for purposes of a customs jurisdictional statute. See Helwig v. United States, 188 U.S. 605, 610, 613, 23 S.Ct. 427, 47 L.Ed. 614 (1903).
Nothing we have seen suggests that Congress intended for “any tax” in the Anti-Injunction Act to include exactions unrelated to taxes that Congress labeled “penalties.”[11] The Anti-Injunction Act does not define the word “tax.” But it does not indicate in any way that the term “tax” can be given a different meaning than in the rest of the Internal Revenue Code. The only Supreme Court case to consider the meaning of “any tax” dates to 1883, and suggested that a “tax” meant anything eollectéd as a tax — even if collected erroneously or illegally — so long as “it was claimed by the proper public officers” *7 to be a “tax.” Snyder v. Marks, 109 U.S. 189, 192, 3 S.Ct. 157, 27 L.Ed. 901 (1883). Since the Government denies that the shared responsibility payment is a tax, Snyder, at least, suggests that we should credit the Government. See Liberty Univ., — F.3d at (Davis, J., dissenting).
Importantly, aside from the Fourth Circuit’s recent decision, no court has ever held that “any tax” under the Anti-Injunction Act includes exactions that Congress deliberately called “penalties.” Bailey v. George, 259 U.S. 16, 42 S.Ct. 419, 66 L.Ed. 816 (1922), and Bailey v. Drexel Furniture Co. (Child Labor Tax Case), 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817 (1922), two cases upon which the Fourth Circuit relied heavily, are not to the contrary. In Bailey v. George, the Supreme Court held that the Anti-Injunction Act barred a pre-enforcement challenge to the Child Labor Tax, which Congress had expressly labeled a tax. 259 U.S. at 20, 42 S.Ct. 449. Then, in Child Labor Tax Case, a refund action, the Supreme Court held that the Child Labor Tax was so regulatory in function that it ceased to be a “tax” for constitutional purposes. 259 U.S. at 38, 42 S.Ct. 449. These cases stand for the proposition that exactions that Congress intended to enact as taxes are “tax[es]” within the meaning of the Anti-Injunction Act, but may not be “taxes” for constitutional purposes.[12] See Liberty Univ., — F.3d at — (Davis, J., dissenting). They do not address our issue, which raises a quite different question: whether an exaction that Congress intended as a “penalty” is also a “tax” within the meaning of the Anti-Injunction Act.
Other parts of the Internal Revenue Code reinforce our view that Congress did not intend for the Anti-Injunction Act to cover penalties unconnected to tax liability or enforcement. Taxes and penalties carry distinct meanings in the Code, and Congress has been deliberate when it wants certain penalties to be treated as taxes. See Liberty Univ., — F.3d at — (Davis, J., dissenting). As we discuss further below, Congress expressly defined taxes to include penalties for nonpayment of taxes imposed under Chapter 68, subchapter A and “assessable penalties” imposed under Chapter 68, subchapter B.[13] Congress understandably treated Chapter 68 penalties as taxes, because, unlike the shared responsibility payment, they are imposed for impeding or otherwise failing to comply with tax payment and reporting obligations. See Thomas More, 651 F.3d at 540; cf. Mobile Republican Assembly v. United States, 353 F.3d 1357, 1362 (11th Cir.2003) (treating penalties imposed for violating conditions of non-profit organizations’ tax-exempt status as “taxes” because those conditions determine whether the organization is liable for taxes).[14]
*8 Granted, the Code also refers to “any tax (including any interest, additional amounts, additional tax, and assessable penalties)” imposed by Title 26 when describing the IRS’s assessment authority. See, e.g, 26 U.S.C. § 6201. The Fourth Circuit and the dissent reason that because the IRS is empowered to assess taxes (including assessable penalties), and because the Anti-Injunction Act bars any suit to restrain the assessment of taxes, anything codified in the Internal Revenue Code and assessed by the IRS is subject to the Anti-Injunction Act. See Liberty Univ., — F.3d at —, —. We think that inference leaps too far. The term “assessable penalties” in the Code is generally used to refer to Chapter 68, sub-chapter B penalties (entitled “Assessable Penalties”), not any type of penalty. See, e.g., id. § 4083(d)(3)(B); id. § 6671; id. § 6684; id. § 6688; id. § 6695. Nothing in this language suggests that penalties assessed by IRS but unrelated to taxes— as opposed to interest, additional amounts, additional tax, and assessable penalties commonly found in Chapter 68, subchapter B — would fall under this provision. And if this language truly transformed all penalties into taxes merely because they were codified in the Tax Code and assessed by the IRS, Congress’s deliberate efforts to treat the shared responsibility payment as a penalty, not a tax, would be inexplicable. See Liberty Univ., — F.3d at — - — (Davis, J., dissenting).
Our interpretation is also supported by judicial construction of the Tax Injunction Act, a statute that uses similar language to the Anti-Injunction Act to bar suits to restrain the assessment or collection of state taxes. See 28 U.S.C. § 1341 (“The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.”); Enochs v. Williams Packing & Nav. Co., 370 U.S. 1, 6, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). It is well established that Congress used the term “tax” in the Tax Injunction Act to mean assessments made for the purpose of raising revenues, not regulatory “penalties” intended to encourage compliance with a law.[15] That distinction is in keeping with the aim of the Anti-Injunction Act and Tax Injunction Act, i.e. to avoid federal judicial interference with tax revenues upon which federal and state budgets depend. See Nat’l Private Truck Council, Inc. v. Oklahoma Tax Comm’n, 515 U.S. 582, 586, 115 S.Ct. 2351, 132 L.Ed.2d 509 (1995); Williams Packing, 370 U.S. at 7, 82 S.Ct. 1125.
* Ss *
The nature of appellants’ challenge also demonstrates why the Anti-Injunction Act, by its own terms, does not apply to this suit. Appellants have brought suit for the purpose of enjoining a regulatory command, the individual mandate, that requires them to purchase health insurance from private companies, produces no revenues for the Government, and imposes obligations independent of the shared responsibility payment. They seek injunctive and declaratory relief to prevent anyone from being subject to the mandate, irrespective of whether they intend to comply with it, and irrespective of the *9 means Congress chooses to implement it. The harms appellants allege — the cost of purchasing health insurance from private companies, and violation of their religious belief that insurance expresses skepticism in God’s ability to provide — exist as a result of the mandate, not the penalty. True, appellants also say that they do not intend to comply with the mandate, and that the penalty would be a serious financial burden. But that harm affects only the limited class of individuals who fail to comply when the mandate goes into effect.
The individual mandate and the shared responsibility payment create different legal obligations, for different categories of people, at different times. The mandate— described as the “requirement to maintain minimum essential coverage” in the statute — imposes a legal obligation on “applicable individuals]” to purchase and maintain minimum health care coverage from an insurance company for each month beginning January 2014.[16] Foreign citizens, illegal aliens, prisoners, and those who qualify for religious exemptions are not considered “applicable individuals].”[17]
By contrast, the penalty provisions are not symmetrical with the mandate. Although some who fail to comply with the individual mandate must pay a penalty (the “shared responsibility payment”) to the IRS, others — taxpayers who cannot afford coverage, or who fall below the filing threshold, members of Indian tribes, and any applicable individual whom the Secretary of Health and Human Services deems to have suffered a hardship — do not.[18] Moreover the purchase of health insurance is not to be directed to the Government, as is true of taxes, but rather to private insurers; it is only the penalty that flows to the Government.
That appellants’ suit centers on the mandate is critical. The Anti-Injunction Act only bars suits that seek to restrain the IRS’s assessment and collection of taxes. It has never been applied to bar suits brought to enjoin regulatory requirements that bear no relation to tax revenues or enforcement. Indeed, we have held that the Act does not apply to an IRS regulation that does not, by its terms, pertain to the assessment or collection of taxes. Foodservice and Lodging Inst., Inc. v. Regan, 809 F.2d 842, 846 (D.C.Cir.1987) (allowing challenge to enjoin an IRS regulation regarding employers’ reporting of tips).
It has been suggested that Bob Jones University v. Simon, 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974), and Alexander v. “Americans United” Inc., 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (1974), support the application of the Anti-Injunction Act to this case. Those cases involved constitutional challenges to IRS letter-rulings revoking nonprofit organizations’ tax-exempt status. In Bob Jones, the petitioner challenged the constitutionality of an IRS letter-ruling withdrawing its tax-exempt status by arguing that the ruling’s true motivation was “to regulate the admissions policies of private universities,” not “to protect the revenues.” 416 U.S. at 739, 94 S.Ct. 2038. Plaintiffs similarly challenged the constitutionality of eliminating tax-exempt status for organizations engaged in political lobbying in “Americans United.” 416 U.S. at 755-57, 94 S.Ct. 2053. In both cases, plaintiffs argued — superficially similar to our appellants — that the IRS’s letter-rulings were *10 really regulatory prohibitions, and that plaintiffs’ object was not to restrain the assessment and collection of tax revenues, but to ensure that donors seeking tax deductions would continue to contribute to their organizations. Id. at 760-61, 94 S.Ct. 2053; Bob Jones, 416 U.S. at 738, 94 S.Ct. 2038.
The Supreme Court rejected these arguments in both cases. It began with the proposition — not at issue here — that plaintiffs cannot evade the Anti-Injunction Act merely by pleading constitutional claims. “Americans United,” 416 U.S. at 759-60, 94 S.Ct. 2053; Bob Jones, 416 U.S. at 740-41, 94 S.Ct. 2038. More importantly, it reasoned — and this is the crucial distinction to our case — that the Anti-Injunction Act applied because challenges to IRS letter-rulings revoking tax-exempt status are inextricably linked to the assessment and collection of taxes. “Americans United,” 416 U.S. at 760-61, 94 S.Ct. 2053; Bob Jones, 416 U.S. at 738-40, 94 S.Ct. 2038. Plaintiffs’ arguments that their suits were for the purpose of ensuring contributions, not impeding tax revenues, were also defeated by plaintiffs’ own pleadings, since the only injuries plaintiffs identified involved tax liability. “Americans United,” 416 U.S. at 761, 94 S.Ct. 2053; Bob Jones, 416 U.S. at 738-39, 94 S.Ct. 2038; cf. Liberty Univ., — F.3d at — (describing similar pleadings by plaintiffs in that case). It does not follow from those cases that plaintiffs can never bring a pre-enforcement challenge to a discrete regulatory requirement that imposes obligations unrelated to tax revenues if Congress, in a separate provision, chooses to tax some of those who violate it.
To be sure, it has been held that suits that do not directly seek to restrain tax assessment or collection are nonetheless barred if they are directed at the means by which the IRS achieves those ends. Koin v. Coyle, 402 F.2d 468, 469 (7th Cir.1968). Accordingly, the Anti-Injunction Act bars suits to prevent the IRS from using evidence it had allegedly obtained illegally as the basis for a tax assessment, id.; suits to enjoin IRS agents from disclosing information in corporate tax returns to third parties as part of an audit investigation, Kemlon Prods. and Dev. Co. v. United States, 638 F.2d 1315, 1316, 1318, 1320 (5th Cir.1981); suits to enjoin local officials from giving the IRS information about narcotics traffickers used by the IRS to make jeopardy assessments, Lewis v. Sandler, 498 F.2d 395, 398-99 (4th Cir.1974), and suits to enjoin the IRS from using particular methodologies to calculate tax deficiencies, Campbell v. Guetersloh, 287 F.2d 878, 879, 880-81 (5th Cir.1961). But those cases merely stand for the proposition that the Act bars suits that interfere with ancillary functions to tax collection. Mandating the purchase of health insurance is plainly not such a function.
In short, we are not persuaded by the Fourth Circuit’s reasoning. We think that the Anti-Injunction Act does not, by its terms, cover the shared responsibility payment under the term “any tax.” Our dissenting colleague, however, raises another, more substantial, objection: That Congress affirmatively intended for the Anti-Injunction Act to apply to the shared responsibility payment, because the Affordable Care Act directs that the penalty be “assessed and collected in the same manner as an assessable penalty under sub-chapter B of chapter 68.” 26 U.S.C. § 5000A(g)(l). Since penalties included in that subchapter are “taxes” for purpose of the Anti Injunction Act, the dissent maintains that the shared responsibility payment can only be “assessed and collected in the same manner” as those penalties if *11 it, too, is insulated from pre-enforcement challenges.
The Government argues that “assessed and collected in the same manner” has a more limited meaning; it does not speak to the availability of pre-enforcement review. We agree. “As used in the Internal Revenue Code ... the term assessment involves a recording of the amount the taxpayer owes the Government,” and “is essentially a bookkeeping notation” that is “made by recording the liability of the taxpayer in the office of the Secretary.” Hibbs v. Winn, 542 U.S. 88, 100, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004) (internal quotation marks and citations omitted). The term “collection” refers to the IRS’s “actual imposition of a tax against a plaintiff.” Cohen v. United States, 650 F.3d 717, 726 (D.C.Cir.2011) (en banc). It begins with notice that a taxpayer is liable for an unpaid amount and a demand that the taxpayer pay it. The IRS ordinarily receives that sum when the taxpayer submits payment through any accepted means. If the taxpayer continues to refuse to pay, the IRS can employ various collection methods, including liens and levies on the taxpayer’s property.[19] These terms, in analogous contexts, have been held to exclude the timing of challenges. “Assessing and collecting” a penalty “in the same manner” as a tax, for instance, does not require the same statute of limitations to apply to each. See, e.g., Sage v. United States, 908 F.2d 18, 23-25 (5th Cir.1990).
The phrase “in the same manner,” which modifies “assessment and collection,” moreover, is used throughout the Code to refer to methodology and procedures. For instance, the “[m]ethod of adjustment” for an adjustment made to correct an error is to “assess[ ] and colleet[ ], or refund[ ] or eredit[], the amount thereof in the same manner as if it were a deficiency.” 26 U.S.C. § 1314(b) (emphasis added). A qualified issuer of forest conservation bonds is liable for any tax refund amount not used for forestry conservation purposes, and “[a]ny such amount shall be assessed and collected in the same manner as tax imposed by this chapter, except that subchapter B of chapter 63 (relating to deficiency procedures) shall not apply in respect of such assessment or collection.” Id. § 54B(h)(3)(A) (emphasis added). And “[a]ny underpayment of tax by a partner by reason of failing to comply” with certain requirements “shall be assessed and collected in the same manner as if such underpayment were on account of a mathematical or clerical error.” Id. § 6241(b) (emphasis added). These directions tell the IRS how to calculate and obtain certain sums, not when to do so. See Thomas More, 651 F.3d at 540.
There is more to weaken the dissent’s linguistic analysis. Although the Affordable Care Act states that the shared responsibility payment is to be assessed and collected in the same manner as an assessable penalty under subchapter B, thus tracking the language of Chapter 68’s sentence (assessable penalties “shall be assessed and collected in the same manner as taxes”), the Affordable Care Act omits the next sentence in Chapter 68. That sentence reads that “any reference in this title to ‘tax’ imposed by this title shall be deemed also to refer to the penalties and liabilities provided by [subchapter B].” 26 U.S.C. § 6671(a). The second sentence sweeps broader than the preceding sentence; it means subchapter B assessable penalties — which are all directly related to taxes — are to be treated as taxes for all *12 purposes under the Code. That is why it has universally been held that the Anti-Injunction Act applies to various Chapter 68 assessable penalties.[20] Similarly, the Anti-Injunction Act applies to interest due on taxes because of identical language in another section of the Code requiring that this interest be treated as a tax.[21]
If penalties were equivalent to taxes for all purposes — including the application of the Anti-Injunction Act — the last sentence of section 6671 would be superfluous. It is a hallowed maxim of statutory interpretation that we must give effect, if possible, to all words in a statute. See Duncan v. Walker, 588 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). We do not believe that Congress somehow inadvertently omitted the last sentence in 6671 when it drafted the cross-reference to Chapter 68 assessable penalties in the shared responsibility payment provision. Congress often indicates with specificity when it wants other exactions in the Code to be treated as taxes.[22] And when Congress states that an exaction should be “assessed and collected in the same manner as a tax,” omits this last sentence, and still wishes to bar suits to restrain assessment or collection, it has included specific provisions to do just that.[23] Congress’s deliberate decision not to do so here is telling.
In sum, we read the shared responsibility payment provision, section 5000A(g)(l), as not implicating the Anti-Injunction Act. If we had any doubt about our conclusion, we think our dissenting colleague’s interpretation is further foreclosed by two additional considerations. First, Congress, as we have noted, made the mandate the Affordable Care Act imposes on covered persons to purchase insurance analytically and legally separate from the shared responsibility penalty. Second, since the Anti-Injunction Act’s obvious purpose is to protect the Government’s fisc, we think the Government’s interpretation — that the Act is no bar to pre-enforcement judicial review — if not a waiver, is at least entitled to deference.
We think it quite unlikely that Congress intended to foreclose pre-enforcement judicial review of the mandate even if Congress intended to delay review of the penalty. The scope of the legal obligation imposed by the mandate is broader than the scope of the enforcement mechanism of the penalty. This divergence illustrates persuasively why the Anti-Injunction Act would be an awkward fit — and, therefore, quite unlikely to be what Congress intended. If the Act applied to the mandate, those subject to the mandate but exempt from the penalty would either have no judicial relief — because they could never *13 bring a refund suit — or would be able to sue when others subject to the penalty could not.[24] See South Carolina v. Regan, 465 U.S. 367, 378, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984) (holding that the Anti-Injunction Act does not apply “to actions brought by aggrieved parties for whom [Congress] has not provided an alternative remedy.”). To be sure, that raises a question whether someone subject to the mandate has standing to' challenge the legality of the mandate if he or she does not face a penalty. But it is unnecessary to decide that question to conclude that Congress would be quite reluctant to endorse such a strange scheme for judicial review.
Secondly, the Government’s determination that the Anti-Injunction Act should not be interpreted to bar appellants’ suit is entitled to deference.[25] Cf. Snyder, 109 U.S. at 192, 3 S.Ct. 157. After all, the Government is the sole beneficiary of the Act, which facilitates the IRS’s orderly and uninterrupted collection of taxes and protects IRS collectors from being subject to litigation before they complete these functions. Bob Jones, 416 U.S. at 736-37, 94 S.Ct. 2038.
Past Supreme Court decisions emphasizing the breadth of the Government’s authority to determine whether it will be subject to pre-enforcement suits underscore why the Government’s position as to whether something is a “tax” under the Anti-Injunction Act deserves deference. In Cheatham v. United States, 92 U.S. 85, 23 L.Ed. 561 (1875), the Court explained the purpose of the Anti-Injunction Act by stating that “the government has the right to prescribe the conditions on which it will subject itself to the judgment of the courts in the collection of its revenue.” Id. at 89. And in Helvering v. Davis, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307 (1937), the Court held that the predecessor to the Anti-Injunction Act could be waived by the Government in litigation. Id. at 639, 57 S.Ct. 904. We acknowledge that Helvering may well be an anomaly predating more stringent jurisdictional limitations, and that the Government has disclaimed any explicit waiver of the Anti-Injunction Act in its recent filings before the Supreme Court. Still, the Court has recognized that pre-enforcement suits restraining the assessment or collection of taxes might not be barred if they are inconsistent with the Act’s purposes. See Williams Packing, 370 U.S. at 7, 82 S.Ct. 1125; see also Bob Jones, 416 U.S. at 740, 94 S.Ct. 2038 (suggesting that if the IRS’s interpretations were without legal basis or *14 “unrelated to the protection of the revenues,” the Act might not apply).
The Government’s reading of section 5000A(g)(l), the shared responsibility payment provision, as not invoking the Anti-Injunction Act is entitled to weight. That provision, after all, delegates administration and enforcement powers to the IRS. Whether Congress meant to invoke the Anti-Injunction Act through the cross-reference in the penalty provision is a question that goes to the timing of the Government’s enforcement powers. The Government has advanced a perfectly plausible reading of the statute (indeed, in our view, the better one), and therefore we accept it.
Ill
Appellants’ primary argument why the individual mandate exceeded Congress’s enumerated powers is that Congress cannot require individuals with no connection to interstate commerce, and no desire to purchase a product, nonetheless to do so. Congress’s authority to regulate commerce, they say, extends only to existing commerce, i.e. only to individuals who take affirmative acts that bring them into, or substantially affect, an interstate market, and only for the duration of those activities. For this reason, the mandate also cannot be justified under the Necessary and Proper Clause, because that clause can effectuate only those powers that Congress actually possesses under the Commerce Clause, not create new ones. To hold otherwise would remove any limitations on federal power, at the expense of state sovereignty. Congress, appellants warn, could force individuals to buy any product, in any market, with any penalty— from fines to criminal- prosecution — for non-compliance.
The Government counters that the individual mandate is well within the bounds of congressional power. Congress can regulate even purely local, intrastate economic behavior so long as, in the aggregate, it substantially affects interstate commerce. The manner in which consumers pay for services in the interstate health care market is such an example. Because virtually everyone will, at some point, need health services, no one is truly inactive, and the health services market is inextricably intertwined with health insurance. Congress found that those who do not purchase health insurance, and instead self-insure, almost inevitably take health care services they cannot afford. Hospitals, by virtue of federal law and professional obligation, provide these services, and as a result, $43 billion in annual costs are shifted to the insured, through higher premiums. That, in turn, makes health insurance less affordable and increases the total number of uninsured. Therefore, it is argued that Congress rationally concluded that decisions about how to pay for health care, in the aggregate, substantially affect interstate commerce. The Government contends, moreover, that the individual mandate can be upheld as an essential element of the Affordable Care Act’s broader reforms, like the guaranteed issue and community rating requirements, which all agree are within Congress’s power. That is because Congress found that absent the mandate, the guaranteed issue and community rating requirements would lead individuals to wait to buy insurance until they needed care, causing higher premiums, again reducing the number of insured, and destroying the efficacy of Congress’s regulatory scheme.
The Government concedes the novelty of the mandate and the lack of any doctrinal limiting principles; indeed, at oral argument, the Government could not identify any mandate to purchase a product or service in interstate commerce that would *15 be unconstitutional, at least under the Commerce Clause. But the Government does stress that the health care market is factually unique; there are few other markets, it says, where participation is a virtual certainty, or where declining to buy a product disproportionately causes a national economic problem.
A.
As is apparent, appellants have brought a facial challenge to the individual mandate. Appellants recognize that a facial challenge theoretically must establish “that no set of circumstances exists under which the [law] would be valid.” United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). But unlike the plaintiffs before the Sixth Circuit, appellants were careful to avoid conceding there were any valid applications of the law. Cf. Thomas More, 651 F.3d at 556, 561-62, 564 (Sutton, J., concurring). Instead, appellants’ theory of the Commerce Clause would invalidate virtually all conceivable applications of the mandate.
Since, according to appellants, Congress only has the power to regulate individuals who are affirmatively acting in ways that affect a market, and for the duration of their activity, Congress also categorically lacks authority to compel individuals to maintain participation in a market into the future. No one currently active in the health insurance market will necessarily be active in 2014, when the mandate goes into effect, or remain active in that market in perpetuity, absent the mandate. Nor do appellants here concede that Congress could impose a mandate to require individuals to purchase insurance when they arrive at a hospital for treatment and maintain that insurance indefinitely. The requirement to maintain coverage into the future, under their theory, dooms the mandate in its entirety.
To be sure, some applications of the mandate might conceivably be constitutional even under appellants’ theory- — for instance, if the mandate were limited to compelling those individuals presently active in the health insurance market to purchase another month or year of coverage. But viewing those applications in isolation may be different from considering them in the context of a law that, under appellants’ theory, predominantly consists of invalid applications that exceed Congress’s authority. Though facial challenges are presumptively disfavored, the Supreme Court nonetheless invalidated the Gun-Free School Zones Act in toto in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), even after suggesting there were circumstances in which the law might have been constitutionally applied (e.g. if the gun had, in fact, traveled in interstate commerce). Id. at 561-62, 567, 115 S.Ct. 1624. Perhaps facial invalidation was justified because the Supreme Court assumed that in practice, most applications of the law would be unconstitutional, or because differentiating between constitutional and unconstitutional applications would be too difficult.[26] But Lopez is silent on this point, as are subsequent cases. That cautions against assigning dispositive significance to the issue here, and we do not.
We think we are obliged to confront the gravamen of appellants’ argument as to the scope of the Commerce Clause.
B.
Appellants’ central objection to the mandate is that Congress, for the first *16 time, has actually commanded that all Americans purchase a product, health insurance, that many of them have never purchased before, never wish to purchase, and may never need. Appellants do not question that Congress can regulate the interstate health care and health insurance markets, or that Congress reasonably could conclude that decisions about whether to purchase health insurance substantially affect interstate commerce. The contested issue here is whether the Government can require an immensely broad group of people — all Americans, including uninsured persons with no involvement in the health insurance and health care markets — to buy health insurance now, based on the mere likelihood that most will, at some point, need health care, thus virtually inevitably enter that market, and consequently substantially affect the health insurance market. Appellants say that Congress cannot regulate based on such sweeping generalizations. Only individuals who are voluntarily engaging in an “activity” related to interstate commerce — not the uninsured, who are “inactive” — are within the scope of the Commerce Clause.
The mandate, it should be recognized, is indeed somewhat novel, but so too, for all its elegance, is appellants’ argument. No Supreme Court case has ever held or implied that Congress’s Commerce Clause authority is limited to individuals who are presently engaging in an activity involving, or substantially affecting, interstate commerce.
We look first to the text of the Constitution. Article I, § 8, cl. 3, states: “The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.” (emphasis added). At the time the Constitution was fashioned, to “regulate” meant, as it does now, “[t]o adjust by rule or method,” as well as “[t]o direct.”[27] To “direct,” in turn, included “[t]o prescribe certain measure[s]; to mark out a certain course,” and “[t]o order; to command.”[28] In other words, to “regulate” can mean to require action, and nothing in the definition appears to limit, that power only to those already active in relation to an interstate market. Nor was the term “commerce” limited to only existing commerce. There is therefore no textual support for appellants’ argument. So we turn to Supreme Court decisions.
The Framers, in using the term “commerce among the states,” obviously intended to make a distinction between interstate and local commerce, but Supreme Court jurisprudence over the last century has largely eroded that distinction. See Lopez, 514 U.S. at 553-61, 115 S.Ct. 1624; id. at 568-75, 115 S.Ct. 1624 (Kennedy, J., concurring). Today, the only recognized limitations are that (1) Congress may not regulate non-economic behavior based solely on an attenuated link to interstate commerce, and (2) Congress may not regulate intrastate economic behavior if its aggregate impact on interstate commerce is negligible. See United States v. Morrison, 529 U.S. 598, 610, 615-19, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); Lopez, 514 U.S. at 558-61, 566-67, 115 S.Ct. 1624. Those limitations are quite inapposite to the constitutionality of the individual mandate, which certainly is focused on economic behavior — if only decisions whether or not to purchase health care insurance or to seek *17 medical care — that does substantially affect interstate commerce.
To be sure, a number of the Supreme Court’s Commerce Clause cases have used the word “activity” to describe behavior that was either regarded as within or without Congress’s authority.[29] But those cases did not purport to limit Congress to reach only existing activities. They were merely identifying the relevant conduct in a descriptive way, because the facts of those cases did not raise the question— presented here — of whether “inactivity” can also be regulated. See Florida, 648 F.3d at 1286. In short, we do not believe these cases endorse the view that an existing activity is some kind of touchstone or a necessary precursor to Commerce Clause regulation.
We think the closest Supreme Court precedent to our case is Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). There, a farmer ran afoul of his allowed wheat acreage under the Agricultural Adjustment Act of 1938 by growing additional wheat, not for sale, but to feed his family and his livestock. Id. at 114-15, 118-19, 63 S.Ct. 82. Filburn argued that the Act was unconstitutional as applied to him because he was not using the excess wheat for any activity in the interstate market. The Supreme Court unanimously rejected this claim. It held that even growing wheat for personal consumption, not for sale in any market, could affect the national price, and therefore was within Congress’s commerce power. Id. at 127-28, 63 S.Ct. 82. This conclusion was not only because his wheat might be diverted into the national market, as was recognized in Gonzales v. Raich, 545 U.S. 1, 18-19, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005). Justice Jackson said even “if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense competes with wheat in commerce. The stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon.” Wickard, 317 U.S. at 128, 63 S.Ct. 82 (emphasis added). Justice Jackson thus recognized that the Act “force[d] some farmers into the market to buy what they could provide for themselves.” Id. at 129, 63 S.Ct. 82. Although a regulation limited the size of the farms covered, the logic of the opinion would apply to force any farmer, no matter how small, into buying wheat in the open market. See Raich, 545 U.S. at 20, 125 S.Ct. 2195. Wickard, therefore, comes very close to authorizing a mandate similar to ours, at least indirectly, and the farmer’s “activity” could be as incidental to the regulation as simply owning a farm.
Indeed, were “activities” of some sort to be required before the Commerce Clause could be invoked, it would be rather difficult to define such “activity.” For instance, our drug and child pornography laws, criminalizing mere possession, have been upheld no matter how passive the possession, and even if the owner never actively distributes the contraband, on the theory that possession makes active trade more likely in the future.[30] And in our situation, as Judge Sutton has cogently demonstrated, many persons regulated by the mandate would presumably be legitimately regulated, even if activity was a precursor, once they sought medical care or health insurance. Thomas More, 651 *18 F.Bd at 560-61 (Sutton, J., concurring). The Supreme Court has repeatedly rejected these kinds of distinctions in the past— disavowing, for instance, distinctions between “indirect” and “direct” effects on interstate commerce — because they were similarly unworkable. See Wickard, 317 U.S. at 119-20, 63 S.Ct. 82; see also Lopez, 514 U.S. at 569-71, 115 S.Ct. 1624 (Kennedy, J., concurring).
Appellants have sought to avoid this logic by asserting that even if one could be obliged to buy insurance when one sought medical care, one cannot be obliged to keep it. Although that argument, as we have noted, avoids the facial challenge objection, it strikes us as rather unpersuasive on the merits. Congress, which would, in our minds, clearly have the power to impose insurance purchase conditions on persons who appeared at a hospital for medical services — as rather useless as that would be — is merely imposing the mandate in reasonable anticipation of virtually inevitable future transactions in interstate commerce.
* * *
Since appellants cannot find real support for their proposed rule in either the text of the Constitution or Supreme Court precedent, they emphasize both the novelty of the mandate and the lack of a limiting principle. The novelty — assuming Wickard doesn’t encroach into that claim — is not irrelevant. The Supreme Court occasionally has treated a particular legislative device’s lack of historical pedigree as evidence that the device may exceed Congress’s constitutional bounds.[31] But appellants’ proposed constitutional limitation is equally novel — one that only the Eleventh Circuit has recently — and only partially— endorsed. Florida, 648 F.3d at 1285-88. Moreover, the novelty cuts another way. We are obliged — and this might well be our most important consideration — -to presume that acts of Congress are constitutional. Morrison, 529 U.S. at 607, 120 S.Ct. 1740. Appellants have not made a clear showing to the contrary.
We acknowledge some discomfort with the Government’s failure to advance any clear doctrinal principles limiting congressional mandates that any American purchase any product or service in interstate commerce. But to tell the truth, those limits are not apparent to us, either because the power to require the entry into commerce is symmetrical with the power to prohibit or condition commercial behavior, or because we have not yet perceived a qualitative limitation. That difficulty is troubling, but not fatal, not least because we are interpreting the scope of a long-established constitutional power, not recognizing a new constitutional right. Cf. Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 129 S.Ct. 2252, 2272, 173 L.Ed.2d 1208 (2009) (Roberts, C.J., dissenting). It suffices for this case to recognize, as noted earlier, that the health insurance market is a rather unique one, both because virtually everyone will enter or affect it, and because the uninsured inflict a disproportionate harm on the rest of the market as a result of their later consumption of health care services.
Appellants’s related argument is that upholding the mandate would turn the Commerce Clause into a federal police power, at the expense of state sovereignty. But the distinctions that separate national and local spheres have been understood as those between intrastate and interstate commerce, and between traditional, non- *19 economic areas of state concern and those involving commerce. Morrison, 529 U.S. at 617-19, 120 S.Ct. 1740. Appellants have not argued that health care and health insurance are uniquely state concerns, and decades of established federal legislation in these areas suggest the contrary. See United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 539, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); Florida, 648 F.3d at 1302-03. Nor do we think states’ powers over health and general welfare make the health care industry a traditional state concern. Moreover, if Congress can regulate even instances of purely local conduct that were never intended for, or entered, an interstate market, we think Congress can also regulate instances of ostensible inactivity inside a state. The aggregate effect of that behavior, after all, is just as injurious to interstate commerce. Finally, appellants’ position would not preserve state sovereignty. A state that requires all its citizens to purchase health insurance is making them “active” in the interstate market; if the state thereby cedes control over its health care policy to the federal government, its experimentation is tantamount to a relinquishment of its own power. Thomas More, 651 F.3d at 561-62 (Sutton, J., concurring); cf. Veazie v. Moor, 55 U.S. 568, 14 How. 568, 574, 14 L.Ed. 545 (1853).
❖ * *
Appellants’ view that an individual cannot be subject to Commerce Clause regulation absent voluntary, affirmative acts that enter him or her into, or affect, the interstate market expresses a concern for individual liberty that seems more redolent of Due Process Clause arguments. But it has no foundation in the Commerce Clause. The shift to the “substantial effects” doctrine in the early twentieth century recognized the reality that national economic problems are often the result of millions of individuals engaging in behavior that, in isolation, is seemingly unrelated to interstate commerce. See Lopez, 514 U.S. at 555-56, 115 S.Ct. 1624. That accepted assumption undermines appellants’ argument; its very premise is that the magnitude of any one individual’s actions is irrelevant; the only thing that matters is whether the national problem Congress has identified is one that substantially affects interstate commerce. Indeed, in case after case, a version of appellants’ argument — that Congress’s power to regulate national economic problems, even those resulting from the aggregated effects of intrastate activity, only extends to particular individuals if they have also affirmatively engaged in interstate commerce — has been rejected on that basis. See United States v. Wrightwood Dairy Co., 315 U.S. 110, 121, 62 S.Ct. 523, 86 L.Ed. 726 (1942) (surveying cases). Whether any “particular person ... is, or is not, also engaged in interstate commerce,” the Supreme Court expressly held, is a mere “fortuitous circumstance” that has no bearing on Congress’s power to regulate an injury to interstate commerce. Id.
Wickard is very much in that vein. In Wickard, it mattered not that Filburn’s annual wheat output was trivial in relation to national production. Nor did it matter that Filburn was being penalized for behavior that had only the most tenuous impact on interstate commerce in of itself, since Filburn never intended the wheat to be used for commercial purposes, never sold it, and used it only to sustain his home farm. It was also irrelevant that the wheat quota could compel even those farmers with no intention of selling any wheat, in any market, to enter the interstate market. All that mattered were the overall dynamics of the wheat market — in other words, generalizations about likely, future economic behavior. If farmers like Filburn all exceeded their quotas, the me *20 chanics of the wheat market made it inevitable that the interstate market would be impacted — either by the likelihood that the high price of wheat Congress was trying to maintain would induce some unspecified number of farmers to sell wheat at market after all, or the probability that farmers who had enough wheat for their own use would stop buying wheat at market. Either way, these economic forecasts — and not any affirmative acts by people like Filburn — were enough to sustain the law. 317 U.S. at 117, 126-28, 63 S.Ct. 82.
Cases since Wickard have minimized the significance of any particular individual’s behavior yet further. They have repeatedly confirmed that the actual impact of any one individual’s conduct on interstate commerce is immaterial, so long as a rational basis exists for believing that a congressional enactment, as a whole, substantially relates to interstate commerce. Raich, 545 U.S. at 17-19, 125 S.Ct. 2195; Lopez, 514 U.S. at 557, 115 S.Ct. 1624. A single individual need not even be engaged in any economic activity — ie. not participating in any local or interstate market — so long as the individual is engaged in some type of behavior that would undercut a broader economic regulation if left unregulated. Raich, 545 U.S. at 36, 125 S.Ct. 2195 (Scalia, J., concurring). And a single individual need not even be engaging in the harmful activity that Congress deems responsible for a national economic problem; it is enough that in general, most do. Thus, when Congress finds that organized crime harms interstate commerce, and that most loan sharks are part of organized crime, Congress can regulate even those individual loan sharks who are not part of organized crime. See Perez v. United States, 402 U.S. 146, 147, 153-57, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). Similarly, it is irrelevant that an indeterminate number of healthy, uninsured persons will never consume health care, and will therefore never affect the interstate market. Broad regulation is an inherent feature of Congress’s constitutional authority in this area; to regulate complex, nationwide economic problems is to necessarily deal in generalities. Congress reasonably determined that as a class, the uninsured create market failures; thus, the lack of harm attributable to any particular uninsured individual, like their lack of overt participation in a market, is of no consequence.
That a direct requirement for most Americans to purchase any product or service seems an intrusive exercise of legislative power surely explains why Congress has not used this authority before — but that seems to us a political judgment rather than a recognition of constitutional limitations. It certainly is an encroachment on individual liberty, but it is no more so than a command that restaurants or hotels are obliged to serve all customers regardless of race, that gravely ill individuals cannot use a substance their doctors described as the only effective palliative for excruciating pain, or that a farmer cannot grow enough wheat to support his own family.[32] The right to be free from federal regulation is not absolute, and yields to the imperative that Congress be free to forge national solutions to national problems, no matter how local — or seemingly passive— their individual origins. See Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258-59, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).
For the foregoing reasons, we affirm the decision of the district court.

So ordered.

. 26 U.S.C. § 5000A(a) (individual mandate); id. § 5000A(b)-(c) (penalty provision).

. These findings are codified at 42 U.S.C. § 18091 (a.)(l)-(3) and discussed extensively in other opinions. See Florida, 648 F.3d at 1244-47.

. 42 U.S.C. § 2000bb et seq.

. We affirm the dismissal of appellants’ Religious Freedom Restoration Act claim, because we agree with the district court’s reasoning that appellants failed to allege facts showing that the mandate will substantially burden their religious exercise. See Mead, 766 F.Supp.2d at 41-43.

. See Br. for Amici Curiae Mortimer Caplin & Sheldon Cohen in Supp. of Appellees and Affirmance.

. 26 U.S.C. § 7421(a) (emphasis added).

. 26 U.S.C. § 5000A(b); H.R. 3962, § 501, 111th Cong. (2009); H.R. 3200, § 401, 111th Cong. (2009); S. 1796, § 1301, 111th Cong. (2009); see also Liberty Univ.,- F.3d at - (Davis, J., dissenting).

. See Thomas More v. Obama, 651 F.3d 529, 551 (6th Cir.2011) (Sutton, J., concurring) (surveying usage).

. 42 U.S.C. § 18091(a)(2)(A), (C), & (I).

. 26 U.S.C. § 5000A(g)(2).

. The Act also has no legislative history. Bob Jones Univ. v. Simon, 416 U.S. 725, 736, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974).

. Similarly, Lipke v. Lederer, 259 U.S. 557, 42 S.Ct. 549, 66 L.Ed. 1061 (1922), merely held that the Anti-Injunction Act does not always apply even if Congress labels an exaction a "tax.” There, Congress made clear, in the rest of a criminal statute, that it did not really intend the exaction to be a tax. Id. at 561-62, 42 S.Ct. 549. That is different from our situation, where Congress repeatedly expressed its intention that the shared responsibility payment was to be a “penalty.”

. 26 U.S.C. § 6665(a) (stating that "taxes” also refer to Chapter 68, subchapter A penalties); id. § 6671(a) (stating that "taxes” also refer to Chapter 68, subchapter B penalties).

.The Fourth Circuit has also held that all premiums due under the Coal Act — which is outside Chapter 68, subchapter B of the Code — are "taxes” for purposes of the Anti-Injunction Act, but it reached that conclusion only after assuming, without analysis, that the definition of a "tax” under the bankruptcy law is the same as the Anti-Injunction Act. In re Leckie Smokeless Coal Co., 99 F.3d 573, 583 (4th Cir.1996).

. Chamber of Commerce v. Edmondson, 594 F.3d 742, 761-62 (10th Cir.2010); RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indem. Co., 169 F.3d 448, 457 (7th Cir.1999); Ben Oehrleins and Sons and Daughter, Inc. v. Hennepin Cnty., 115 F.3d 1372, 1382-83 (8th Cir.1997); Travelers Im. Co. v. Cuomo, 14 F.3d 708, 713-14 (2d Cir.1993) (overruled on other grounds). Courts do not defer to the labels states — as opposed to Congress — bestow on exactions, because the meaning of a “tax” under the Tax Injunction Act is a question of federal, not state, law. See Edmondson, 594 F.3d at 761.

. 26 U.S.C. § 5000A(a).

. Id. § 5000A(d)(2)-(4).

.Id. § 5000A(b), (e). Violators will only owe the penalty starting in April 2015, when it must be enclosed with their tax returns.

. See 26 U.S.C. § 6303 (notice); id. § 6311 (means of payment); id. § 6321 (liens); id. § 6331 (levies).

. See Botta v. Scanlon, 314 F.2d 392, 393 (2d Cir.1963) (surveying cases); see also Souther v. Mihlbachler, 701 F.2d 131, 132 (10th Cir.1983); Kelly v. Lethert, 362 F.2d 629, 633 (8th Cir.1966); Shaw v. United States, 331 F.2d 493, 496 (9th Cir.1964).

. See Nuttelman v. Vossberg, 753 F.2d 712, 714 (8th Cir.1985) (interpreting 26 U.S.C. § 6601(e)(1)); Prof'l Eng’r, Inc. v. United States, 527 F.2d 597, 599 (4th Cir.1975) (similar).

. See, e.g., 26 U.S.C. § 6601 (interest on tax treated as tax); id. § 6242(c)(3)(B) (payments of certain additional liabilities incurred by partnerships "treated as an underpayment of tax”); id. § 6665 (additions to the tax, additional amounts, and penalties under Chapter 68, subchapter A treated as tax).

.See, e.g., 26 U.S.C. § 6305(a)-(b) (directing that the assessment and collection of Social Security-related liabilities should be "assess[ed] and collect[ed] ... in the same manner ... as if such amount were a tax,” and adding additional provisions expressly barring "any action ... brought to restrain or review the assessment and collection” of those liabilities).

. Whether appellants or anyone else will fall under this category, as individuals exempted from the penalty because they cannot afford coverage, cannot be determined without knowing their future household income. See 26 U.S.C. § 5000A(e)(l)(A). By that point, of course, appellants may have lost the opportunity to bring a pre-enforcement challenge to the mandate irrespective of whether they are allowed to do so under the Anti-Injunction Act. Whether framed as an issue of ripeness or remedies, the outcome is the same: The applicability of the Anti-Injunction Act to challenges to the individual mandate cannot be conflated with challenges to the minimum essential coverage penalty.

. Earlier in this litigation, the Government argued that the Anti-Injunction Act barred this suit because the shared responsibility payment is a "tax'’ under the Act. See Seven-Sky v. Holder, No. 1:10-cv-00950 at 15-16 (D.D.C. Aug. 20, 2010) (memorandum of law in support of defendants’ motion to dismiss). The Government has since abandoned that position. It now concludes that appellants’ suit "poses no realistic threat of ... disruption” to the "federal government's administration of the Tax Code,” and that the cross-reference to Chapter 68 assessable penalties in 5000A(g)(l) should not be read as invoking the Anti-Injunction Act. Fed. Gov’t Supplemental Br. at 3-5, 7, Liberty Univ., Inc. v. Geithner, No. 10-2347 (4th Cir. May 31, 2011).

. See Richard H. Fallon, Jr., Fact and Fiction About Facial Challenges, 99 Calif. L.Rev. 915, 945, 959 (2011).

. Samuel Johnson, 2 Dictionary of the English Language 1619 (4th ed. 1773) (reprinted 1978) (emphasis added) (hereinafter Johnson); see also T. Sheridan, A Complete Dictionary of the English Language (2d ed.) (1789) (same).

. Johnson 514.

. See, e.g., Gonzales v. Raich, 545 U.S. 1, 17, 26, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005); Morrison, 529 U.S. at 610-13, 120 S.Ct. 1740; Lopez, 514 U.S. at 558-61, 115 S.Ct. 1624.

. See Raich, 545 U.S. at 19, 125 S.Ct. 2195; United States v. Sullivan, 451 F.3d 884, 891—92 (D.C.Cir.2006); United States v. Forrest, 429 F.3d 73, 78-79 (4th Cir.2005).

. See, e.g., Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., — U.S. -, 130 S.Ct. 3138, 3159, 177 L.Ed.2d 706 (2010); Printz v. United States, 521 U.S. 898, 905, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).

. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258-59, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Raich, 545 U.S. at 6-7, 125 S.Ct. 2195; Wickard, 317 U.S. at 128, 63 S.Ct. 82; see also Thomas More, 651 F.3d at 557 (Sutton, J., concurring).